The DOWNTOWNER CORPORATION v.
COMMONWEALTH SECURITIES CORPORATION

5-4257                                    419 S. W. 2d 126

Opinion delivered October 2, 1967

*Reinberger, Eilbott, Smith & Staten,* for appellant.

*Coleman, Gantt, Ramsey & Cox,* for appellee.

LYLE BROWN, Justice. Appellant, The Downtowner Corporation, based at Memphis, Tennessee, brought this suit to recover on an alleged implied contract existing between Downtowner and appellee, Commonwealth Securities Corporation of Pine Bluff. Whether or not an implied contract in fact was created between the parties is the determining issue before us.

In 1962 Downtowner entered into a licensing agreement with Franklin D. Keith and Robert C. Lowther.

That agreement gave the licensees the right to use the trade name, mark, and design of Downtowner in the operation of a new motel to be constructed by licensees in Pine Bluff. For that privilege, licensees agreed to pay ten cents per day per motel room as a royalty and five cents per day for advertising expenses. There was also a provision for the payment of sign rentals. Licensees also committed themselves to purchase from licensor, or its subsidiaries, practically every item needed in the day-to-day operation of a modern motel. These need not be here itemized but the items of royalty fees, payment for advertising, and for sign rentals are important because recovery is sought for them.

Keith and Lowther proceeded to construct a motor inn of 91 rental units and, as authorized in the licensing agreement, operated under the name of Downtowner Motor Inn. The inn was constructed on land owned by Commonwealth, a long-term lease having been executed between Keith, Lowther, and Commonwealth. The lease payments were subrogated to the construction financing furnished by a savings and loan association. Keith and Lowther became heavily indebted by 1965 to numerous creditors in Pine Bluff and to the parent Downtowner in Memphis. In June of that year, Keith and Lowther quitclaimed all their interest (except the licensing agreement, which was non-assignable) to Commonwealth and ostensibly went to Louisiana.

It was Commonwealth's decision that the interests of all creditors would best be served if the "doors could be kept open" until the property could be leased or sold to some experienced and reliable operator. Commonwealth retained Keith's and Lowther's manager. The president and secretary of Commonwealth, inexperienced in the hotel or motel business, took the responsibility of looking after financial affairs as best they could.

It was thought wise to first contact Downtowner in Memphis. It was desired that Downtowner purchase the

property, or in the alternative, enter into a managerial arrangement. A meeting was set up with R. L. Kirkpatrick, executive vice-president of Downtowner, for July 1, 1965. This was only seven days after Commonwealth had taken over the operation. P. R. Clark, Commonwealth's secretary, and the innkeeper, represented Commonwealth at the meeting in Memphis.

The Memphis meeting started a series of contacts and negotiations which continued until February 1966. By that time it appeared that a satisfactory arrangement could not be consummated between the parties. During the interim, Commonwealth had purchased and paid for various Downtowner operating supplies and in most respects operated as if it were a part of the Downtowner chain. Late in February 1966, Downtowner notified Commonwealth to remove all evidence of the Downtowner trademark which appeared on innumerable items used in the daily operations. Commonwealth set about to comply. The name was changed to Down Town Motel. Complaint was registered because of the similarity of that name to "Downtowner." The name was subsequently changed to "Ambassador Motel."

Suit was filed on or near March 30, 1966, by Downtowner, seeking royalty and advertising fees for the period beginning with June 23, 1965. Additionally, judgment was sought for sign rental accruals. Since there had been no affirmative commitment by Commonwealth to pay any of these charges, this question arises: was a contract *implied in fact* between the parties? That is the thrust of appellant's argument.

No definition by this court of an implied contract has been called to our attention. However, we have cases on the subject and the holdings there are consistent with the law to be shortly cited. For example, see *Worth James* v. *P. B. Price Const. Co.*, 240 Ark. 628, 401 S. W. 2d 206 (1966); *Caldwell* v. *Missouri State Life Insurance Co.*, 148 Ark. 474, 230 S. W. 566 (1921); and *Blake* v. *Scott*, 92 Ark. 46, 121 S. W. 1054 (1909).

Confusion has resulted from the interchangeable use of the terms "implied contract" and "quasi-contract." Quasi-contracts are not based on promises to pay or perform. They are obligations which are creatures of the law designed to afford justice. Generally, an indispensable element of a contract, express or implied in fact, is a promise.

> "This latter class [implied contracts] consists of obligations arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words. Such transactions are true contracts and have sometimes been called contracts implied in fact. The elements requisite for an informal contract, however, are identical whether they are expressly stated or implied in fact." *Williston on Contracts*, Third Edition, Section 3 (1957).

*Restatement* recognizes an exception to the rule that a promise must be oral or written, "or must be inferred wholly or partly from such conduct as justified the promisee in understanding that the promisor intended to make a promise." *Restatement, Contracts*, § 5 (1932). That exception is stated in § 72 (2):

> "Where the offeree exercises dominion over things which are offered to him, such exercise of dominion in the absence of other circumstances showing a contrary intention is an acceptance. If circumstances indicate that the exercise of dominion is tortious the offeror may at his option treat it as an acceptance, though the offeree manifests an intention not to accept."

That exception, however, is not here applicable. It should be noted that the exception is predicated on an *offer*. No offer, written or oral, was ever made by Downtowner of Memphis to Commonwealth which designated a tender of specific services covered by royalties, fees,

and sign rentals. We have previously mentioned the July 1 conference in Memphis. Following that, ten letters were exchanged between the two parties over a period of eight months. An operational vice-president of Downtowner, and possibly another official, went to Pine Bluff and visited the property. At no time were royalties, fees, or sign rentals mentioned to Commonwealth officials. It is true that appellant made some monthly billings addressed "Downtowner of Pine Bluff." They were not addressed to Commonwealth. Surely, had Downtowner of Memphis been honestly looking to Commonwealth for these billings, Downtowner would have mentioned the alleged monthly delinquencies to Commonwealth in at least one of the many letters written Commonwealth. Moreover, as late as January 1966, Downtowner requested of Keith and Lowther that they pay the debts being sought in this suit from Commonwealth.

The circumstances just recited weaken the contention that the billings to Downtowner of Pine Bluff constituted notice to Commonwealth that the latter was expected to pay. Keith's and Lowther's licensing agreement with Downtowner of Memphis was in fact not cancelled until March 2, 1966. Under the terms of that agreement, Keith and Lowther could not transfer the license to a third party. So it cannot be said that Commonwealth succeeded to the privileges and obligations of that contract. Any obligations arising between the parties in this case had to result from some agreement made between them after July 1, 1965.

When Commonwealth took over the enterprise it is undisputed that only a brief operation was anticipated. Is it reasonable that Commonwealth would want to subscribe to the involved services? The business was already burdened with debt and the interim operation was costly to Commonwealth. Had Commonwealth's secretary been told at the Memphis meeting that royalty payments, advertising fees, and sign rentals would be re-

quired if the name "Downtowner" was used, it is more reasonable to believe that the connection with Downtowner at Memphis would then and there have been abandoned.

The endeavor of Commonwealth to keep the business open was expected to benefit all the other creditors, including appellant Downtowner. The Pine Bluff Downtowner was one of its nationwide affiliates. Rehabilitation would mean a retention of that association. It would be profitable to appellant and the supply firms owned by it. The fact that Downtowner, Memphis, had good reason to benefit from continuing its Pine Bluff connection is significant in evaluating the intent of the parties.

From what has already been said, our evident holding is that Commonwealth was not guilty of tortious conduct from June 23, 1965, until February 1966. February marks the date Commonwealth was requested to remove all Downtowner signs, marks, trade-marks, and similar indications that the operation was a Downtowner affiliate.

We now consider the second time period, namely the time during which the name "Down Town Motel" was used. Roughly, that period would be from early March to October 27, 1966. First it should be pointed out that Downtowner uses the words "tortious conduct" and at the same time uses the contract price of $13.65 per day in calculating damages. That is not consistent. Nor is Downtowner's plea for damages consistent with the record. Commonwealth moved to require Downtowner to elect between suing on contract and damages for infringement for use of Downtowner's name. According to the record, Downtowner waived any claim for damages and sought recovery "for the franchise fees for the use of the name."

Irrespective of the facts just recited, Downtowner has not preponderantly shown an infringement during

the second time period. That allegation is based on the similarity of outdoor advertising. In March 1966, Commonwealth directed a painter to change the outdoor signs. Downtowner's registered "crest," topped by a crown, was removed along with the crown. That was changed to a simple rectangle. "Downtowner Motor Inn" was removed and the words "Down Town Motel" were placed in the rectangle. The president of Commonwealth explained that the motel was in downtown Pine Bluff; that he was active in a movement of downtown merchants to bring more business into the heart of the business district; hence he thought the name "Down Town Motel" would not only identify its location but would make a contribution to the efforts of organized downtown merchants.

We hold that Commonwealth's sign was not so deceptively similar to Downtowner's as to be likely to confusion, to the advantage of Commonwealth. See *Dad's Root Beer Co.* v. *Atkin,* 90 F. Supp. 477 (1950).

Finally, Downtowner seeks to enjoin appellee from future appropriation of Downtowner's trade name, mark, and design. Commonwealth is not authorized by contract with Downtowner to utilize those registered marks. We see no necessity in issuing an injunction to cover the subject. That matter has apparently become moot.

Our reasons for denying relief to Downtowner do not coincide with the reasons stated by the trial court. Notwithstanding that difference in reasoning, we affirm the result of the trial court. *Langley* v. *Reames,* 210 Ark. 624, 197 S. W. 2d 291 (1946).

Affirmed.

HARRIS, C. J., not participating.