SHELDON MADDEN ET AL *v.* L. E. HART ET AL

5-5351                                                   439 S. W. 2d 352

Opinion delivered February 15, 1971

*Tackett, Young, Patton & Harrelson,* for appellants.

*Smith, Stroud, McClerkin & Conway,* for appellees.

CONLEY BYRD, Justice. Prior to August 25, 1969, there were two ready mix cement plants in Ashdown. One was known as "Ashdown Ready-Mix" and the other as "Associated Ready-Mix."

The "Ashdown Ready-Mix", originally owned by Robert Earl Priest, an experienced cement finisher, was

acquired by appellant Sheldon Madden for his adult married son, appellant Jack Madden. At the time of trial the Ashdown Ready-Mix was owned by Madden Manufacturing Co., Inc., and operated by Jack Madden.

Associated Ready-Mix was owned by Hart, Thomas & Hart, Inc. L. E. Hart, John Robert Bowman and Jack Hart were the sole stockholders. Associated Ready-Mix was having financial difficulties. Its outstanding liabilities as of August 25, 1969, totaled $48,194.16 and the equipment in its possession had a value of only $29,900.00. Its outstanding and unpaid checks as of that date totalled $2,590.85. Shipments of cement from Foreman Cement Company had been on a C. O. D. basis since April 18, 1969. Some of the stockholders wanted to shut down the operation, some wanted to sell, and some did not want to sell. The disharmony had resulted in at least one fist fight.

The First National Bank of Ashdown had participated in a Small Business Administration loan, its share being $12,900.00. In addition, the bank had loaned L. E. Hart $1,834.31 and held obligations of John Robert Bowman for $2,832.50 and $4,685.00. Also it held unpaid and outstanding checks of Associated Ready-Mix amounting to $2,590.85.

Some time prior to August 25, Jack Hart had contacted Robert Earl Priest concerning a possible sale of Associated. As a result of that contact, negotiations were had with Sheldon Madden, Jack Madden and Robert Earl Priest as prospective purchasers and with L. E. Hart, John Robert Bowman and Jack Hart as the sellers. During all of the negotiations the bank officials evidenced more than a mild curiosity as to the results of the negotiations.

Pursuant to a common understanding, all of the parties—L. E. Hart, John Robert Bowman, Jack Hart, Sheldon Madden, Jack Madden and Robert Earl Priest —met at the bank on the afternoon of August 25th. J. Darrell Bell, the bank's president, and Roy Staggs, the bank's vice president and cashier, were also present at

the meeting. As a result of the negotiations a purchase figure of $48,194.16 was arrived at. At this point some one suggested that something should be put in writing to reflect what agreement had been reached. Exhibit No. 1 was then typed by Roy Staggs under the direction of Mr. Bell and Sheldon Madden. Exhibit No. 1 was signed by L. E. Hart, John R. Bowman and Jack Hart as sellers and Jack Madden as one of the purchasers. Robert Earl Priest declined to sign the agreement. Exhibit No. 1 is as follows:

"August 25, 1969

We the undersigned stockholders of Hart-Thomas & Hart Inc., do hereby agree to transfer all stock in said corporation to Robert Earl Priest and Jack Madden for the consideration of the assumption of all obligations in the name of the corporation and an obligation in the name of L. E. Hart of $1,834.31 plus interest, an obligation of John Robert Bowman of $2,832.50 and another obligation of John Robert Bowman of $4,685.00 plus interest. These notes are payable to the First National Bank in Ashdown.

It is further understood that Mr. Priest and Mr. Madden as of this date, do assume the bills payable, accounts receivable and credit balances due as shown on the list attached to this document. This agreement also covers the assumption of outstanding checks of the corporation totaling $2,590.85.

We the undersigned also agree to refrain from entering the Ready Mix Concrete business in Little River County for the next 36 months.

/s/ L. E. Hart
/s/ John R. Bowman
/s/ Jack Hart

We, the undersigned Robert Earl Priest and Jack Madden do hereby agree to the above.

/s/ Jack Madden

Sworn and subscribed to this 25th day of August 1969.

_____,,

On August 26th following the meeting at the bank, Jack Madden obtained permission from Associated to use one of its trucks to aid Ashdown Ready-Mix in finishing a highway construction job that Associated had been furnishing some of the cement on.

Associated Ready-Mix closed its business on Friday before the Monday, August 25th meeting. It remained closed thereafter. However, its equipment, other than the mixing plant and concrete trucks, was used by Bowman.

The Chancellor found that Sheldon Madden and Jack Madden had entered into a contract on August 25th to purchase Associated Ready-Mix for $48,194.16, which they had breached, and awarded appellees a judgment against Sheldon Madden and Jack Madden for $18,294.16 for the breach thereof. At the same time the Chancellor found that no contract existed between appellees and Robert Earl Priest. For reversal appellants Sheldon Madden and Jack Madden contend that no sales purchase agreement was consummated on August 25th.

Roy Staggs testified that he was a neighbor of Robert Earl Priest and that his first involvement in the negotiations was that of August 25th. At this meeting a discussion by all the parties took place to determine the sales price. Associated's total liabilities were something over $48,000.00. After Mr. Sheldon Madden's $45,000 offer was refused, he then asked his son and Mr. Priest if the $48,000 figure was agreeable and both answered in the affirmative. At this time witness knew that Associated was to be purchased in the name of Jack Madden and Robert Earl Priest. Around 5:30 P.M. Mr. Priest suggested that an attorney should be obtained to draw up the papers. Because it was too late to obtain an attorney Staggs went to a typewriter and,

under the direction of Bell and Sheldon Madden, typed Exhibit No. 1. Admittedly the exhibit covers the items that the bank was primarily interested in. On cross-examination Staggs admitted that subsequent negotiations had been had between the parties. Neither would he deny that he had stated on the morning of August 26th that he knew that Priest was not going to get "involved in that mess." With reservations, Stagg testified that he did not expect Priest to agree to the instrument that was drawn.

Jack Hart stated that the Maddens and Priest all agreed to the proposed $48,000 figure on the 25th and that constituted an acceptance of appellees' proposal. He admitted, however, that there were further negotiations after August 25th and that he had insisted throughout that he was not interested in selling unless he was relieved of the S. B. A. obligation. According to him, the S. B. A. loan was to be retired by Sheldon Madden.

Bowman testified that Sheldon Madden made it clear at the meeting that he was not to be involved in the ownership and that Jack Madden and Robert Earl Priest were the actual purchasers. The only thing he remembered about the S. B. A. loan was the amount of the loan. Nothing was said in his presence about paying off or assuming the S. B. A. loan. On Tuesday morning following the August 25th meeting, Jack Madden called and asked him about getting a mixer truck meeting the requirements for pouring on State highway jobs. Bowman said he told Jack Madden that he assumed it would be all right but he would talk to Jack Hart about it. He then did talk to Jack Hart and Robert Earl Priest even though the deal was not finalized. On cross-examination Bowman admitted that the business was going in the hole and that L. E. Hart had told him that whether or not he was going to sell, they were going to close the business one way or the other. He also admitted that Jack Madden did not, on August 25th, agree to purchase Associated without Mr. Priest.

J. Darrell Bell, president of the First National Bank

of Ashdown, testified that the bank had an interest in the sale because of its loans to appellees and its participation in the S. B. A. loan. Before the August 25th meeting he had ascertained that the S. B. A. loan could be assumed by the purchaser. No mention had been made as to whether the Harts and Bowman would be released, so he had assumed that they would. He also understood that Sheldon Madden had arranged for a $46,000 loan to pay off S. B. A. and other obligations. After the parties at the August 25th meeting agreed to the $48,194.16 figure, some one mentioned that something should be put in writing to reflect what agreements had been reached. His main reason for wanting a written instrument was to set out the indebtedness of Bowman and L. E. Hart. He was surprised to learn that the plant had been shut down on Friday before the meeting. None of the buyers mentioned anything about the shutdown of the plant prior to the August 25th meeting and he did not recall anything being said at the meeting regarding the shutdown. He was also surprised two days after the meeting to find out that Jack Madden was using the cement truck. Mr. Bell assumed that Mr. Sheldon Madden was going to be in the operation and management of the business.

Fred Pickett, an attorney in Ashdown, testified that he represented Mr. Priest. He first became aware of the negotiations around the end of July but he was not actively engaged in the negotiations. On August 26th, he talked with both Bell and Staggs. At that time Staggs laughingly said that he knew that Priest was not going to get involved in that mess. At the same time Bell stated that Priest did agree to go through with the transaction and Bell expressed his concern over it. On October 2, 1969, he again spoke with Bell concerning whether Priest had entered into an agreement to purchase. He quoted Bell as saying, "No, I think Mr. Priest is all right, but if there was an agreement between them on August 25th, he's right in the middle of it."

Some three weeks after August 25th, Jack Hart and Bowman came into Pickett's office and informed him

that Sheldon Madden had agreed for him to draw up the necessary papers to consummate the sale. After talking with all the parties, he realized that they did not have the necessary ingredients for a contract. As a result of that conclusion he caused another meeting to be set up at the bank for the purpose of laying the whole matter out in the open so no one would be confused.

Robert Earl Priest testified that he met Bowman at a cafe after he had received the October 2nd letter from Mr. Stroud, Bowman's counsel, and that he said to Bowman, "John, did I ever agree to buy this thing from you?" According to him Bowman replied, "No." Priest also said that the offer made by Sheldon Madden was on behalf of Jack Madden and himself.

Priest said that at a meeting at Mr. Bell's house on August 23rd, Bell told Jack Hart that it looked like they were going to have to shut the plant down in order to get specific figures because the figures were changing every time they talked.

Shelton Madden testified that his interest in negotiating the purchase was to get Robert Earl Priest and his son Jack in an operation together. That he was not interested in the purchase of this property for his son unless Mr. Priest, who was more experienced, would be involved. After they had agreed on a price, he and Mr. Priest and his son Jack were trying to decide whether or not Mr. Priest and Jack were going to be able to work out their agreement and whether or not to go ahead and purchase the plant. While Priest and Jack Madden were still discussing the deal, he, Sheldon Madden, and Staggs went after a cup of coffee. When he learned that Priest was not going through with the deal, he told the group that he was not interested. Mr. Madden denied that he had reported to anyone before August 25th that he could borrow $46,000 or any other amount. He pointed out that Hart wanted to go into the contracting business and that in order to comply with the licensing law he would be required to make a bond which he would be unable to do with the S. B. A. loan hanging over his head. Because of this

problem, he quoted Hart as saying that Mr. Bell had advised Hart to dispose of the concrete plant in order to get off the S. B. A. loan. Two or three weeks after August 25th they found out that Hart's name could not be removed from the loan. Upon both direct and cross-examination, Mr. Sheldon Madden stated that it was not anticipated that he would own any part of the property. His only interest was to have his son and Mr. Priest in business together. He said that he had been informed two weeks before August 25th that the plant was going to be shut down.

Mr. Jack Madden stated that he agreed to purchase the business if Mr. Priest and he could agree to a partnership—that he did not intend to purchase the business by himself. When he discovered that Mr. Priest would not go through with the deal, he decided that he did not want it either.

When the negotiations surrounding the August 25th meeting are considered in the light of Mr. Staggs' testimony that he did not expect Priest to agree to the instrument that was drawn, and in the light of Fred Pickett's testimony of the statements made by Bell and Staggs the day after the meeting, together with Priest's undenied testimony that Bowman acknowledged at the cafe that Priest had not agreed to purchase the plant, we agree with the trial court that Priest did not agree to purchase the plant on August 25th. A decision to the contrary would have been contrary to the weight of the evidence.

However, we believe that with respect to the Maddens, the Chancellor failed to take into consideration the contract law principle that it is as essential to the finality and completeness of assent that all the parties intended should be bound as it is that all terms should be definitely agreed upon. See *Consolidation Coal Co. v. Yonts,* (6th Cir. 1928) 25 F. 2d 404; *Wilson v. McDaniel,* 247 Ark. 1036, 449 S. W. 2d 954; 17 Am. Jur. 2d *Contracts,* § 23. We can find no evidence in the record to support a finding that the Maddens on August 25th

were consenting to the purchase without Priest's obligation to do likewise. Exhibit No. 1 typed by Staggs at the direction of Bell and Sheldon Madden leaves no room for doubt on that issue.

It is also suggested that Jack Madden in using the cement truck belonging to Associated and in hiring Associated's employee Raymond Fields is estopped to deny his assent. Here again the suggestion is not supported by the record. The testimony of Charles Winning, vice president of Foreman Cement Company, shows that Associated at time of trial had accumulated outstanding invoices of $3,711.40. According to him, these invoices were from sales prior to April 18th when Associated was placed on a C. O. D. basis. The bank officers showed that the outstanding and unpaid checks of the corporation in its hands as of August 25th amounted to $2,590.85. While it is true that Mr. Staggs testified that Associated could have operated after August 25th, we note that the statement is not consistent with their avowed interest in the results of the negotiations nor with the testimony of Mr. Bell relative to the shutdown. Rather we believe that the evidence preponderates in appellants' favor that the August 25th negotiations did not cause the plant shutdown as Bowman testified on cross-examination. Mr. Hart had told him they were going to close the business one way or the other. Thus, when the facts are viewed in their business perspective, it appears to us that Associated, being shut down, was not in a position to deliver to the State highway job and that since Ashdown Ready-Mix had only one truck that would meet the requirements for pouring concrete on a highway job, Jack Madden merely asked for permission to use Associated's truck which he obtained from Bowman. All during the same time Bowman used other equipment of Associated under a claim of right. As we view the evidence, it is insufficient to sustain an estoppel.

What we have said here makes it unnecessary for us to determine whether Sheldon Madden could be held as a principal in view of his admitted agency relationship.

Reversed and remanded for proceedings not inconsistent herewith.

FOGLEMAN, J., dissents in part.

JOHN A. FOGLEMAN, Justice, dissenting. I can readily agree with the chancellor and the majority that the preponderance of the evidence shows that Robert Earl Priest never entered into a binding contract for the purchase from appellees. I do not agree that the decision of the chancellor to hold Jack Madden responsible is clearly against the preponderance of the evidence, and I do not see how the majority can so hold when demeanor evidence is such a vital factor in determining where the preponderance lies. As I will endeavor to demonstrate, it could easily be said that a preponderance of the evidence supports the chancellor's decree in this respect. I do not agree with the chancellor, however, that a preponderance of the evidence shows that Sheldon Madden was bound on the contract, so I do not agree with the majority that it is unnecessary to determine Sheldon Madden's status, nor do I agree that his agency relationship was admitted.

It is pertinent to call attention to some of the chancellor's findings in his opinion and decree in order to better evaluate the evidentiary support, or lack of it, for the results reached. Significant findings are:

1. The testimony of Bell, the bank president, was that of an interested witness.

2. There was no "wavering" or "shading" in the demeanor of Staggs, a bank officer and close friend and next-door neighbor of Robert Earl Priest.

3. Sheldon Madden, without the knowledge of Priest, had an appraisal made of the Associated Ready-Mix equipment before the meeting of August 25.

4. It was agreed at the meeting of August 25 that the land and a certain winch truck were not included in the deal.

5. Appellees' business operated August 22 and had business for the next week and could have reasonably anticipated more business, but it rained on the weekend following August 22.

6. The business was shut down on August 25 because of words and actions of appellants.

7. Appellants were responsible for the mail to Ashdown Ready-Mix being sealed and not taken from the post office after the meeting of August 25.

8. The covenant not to compete was put in the memorandum of agreement at the behest of Sheldon Madden before he left the meeting of August 25.

9. The Maddens did not speak for Priest so as to bind him to a contract to purchase.

10. There is no evidence that Jack Hart, one of the appellees, failed to stand ready and willing to sell when appellants offered to consummate the sale, in spite of conflicting testimony that the sale was conditioned upon his being relieved from the Small Business Administration debt.

11. Sheldon Madden led Jack Hart to believe that the SBA loan would be paid.

12. If Jack Hart "backed out" specific performance would have lain against him.

13. Jack Madden's testimony was evasive.

14. Jack Madden's use of the business truck of appellees in completing a job for which appel-

lees had contracted and his hiring of their foreman were convincing evidence that Jack Madden considered the contract negotiated.

15. The Maddens accomplished their purpose in that Jack Madden's company had all the ready-mix concrete business in Ashdown without a competitor, who could not reopen except at a distinct disadvantage.

16. Jack Madden signed the memorandum of agreement.

17. The evidence that there was no contract if Priest was not a party to it was not persuasive.

The evidence that Sheldon Madden was acting for himself, rather than as agent for his son, does not seem to me to be convincing. There is no question but that Sheldon Madden asked both his son and Priest if the amount of the offer finally made was agreeable. Staggs testified that the purchase was to be in the names of Jack Madden and Priest and that nothing was said about who was putting up the money. Sheldon Madden and Bell dictated the agreement typed by Staggs for the signatures of Jack Madden and Priest, and Sheldon Madden's name did not appear as a purchaser. Staggs testified that Sheldon Madden was not to participate in the ownership or operation and was not to sign the contract. Sheldon Madden was present when his son signed the agreement. Appellee Bowman testified that Sheldon Madden was not to be included in any written instrument, having stated that Jack and Priest were the actual purchasers and that it was clear that Sheldon Madden was not to be involved in the ownership. Bowman also testified that within three weeks after the August 25 meeting Sheldon Madden stated to him that if Jack still wanted the business they were going through with the deal whether Priest did or did not participate. Bell testified that two weeks after the August 25 meeting Sheldon Madden stated that he wished to go through with the arrangement of a $46,000 loan at 9½% if Jack still wanted to. Bell *assumed* that Sheldon

Madden was going to be in the operation and management because of his arrangement for the loan. He recalled that no place on the memorandum was provided for Sheldon Madden's signature, at the latter's request. Sheldon Madden had never operated such a business but had acquired from Priest another such business for his son. Priest testified that Sheldon Madden made the offer on Jack's and Priest's behalf. Sheldon Madden testified that he was assisting his son in order to give him a livelihood and to keep him in Ashdown. He also testified that he did not ever anticipate that he would own any part of the property. He stated that elimination of competition with his son's business was one reason for buying out the competing company. There is really no significant evidence that Sheldon Madden was not acting as agent, rather than as a principal, except by inferences that might have been drawn from the testimony and assumptions made by the parties. The direct testimony recited is certainly stronger than any of the inferences and assumptions.

Even though there was testimony by Sheldon and Jack Madden that Jack did not agree to be bound unless Priest also joined in the agreement, evidence to the contrary seems overwhelming to me, even though there is no question but that Sheldon Madden very much wanted Priest to have an interest in the business. Jack Madden heard Priest's refusal to sign the memorandum, but never indicated in any way to the parties present that his obligation was conditional or that he desired to withdraw his signature or have the signed memorandum returned to him. Staggs testified that Sheldon Madden was present and that he and Sheldon Madden went for coffee after this happened. Staggs also said that a determination was made that the sellers' business should be closed on the 25th of August because the purchasers wanted a cutoff day as to the creation of debts and the receipt of accounts receivable and that the sellers did shut down on that date and remained shut down. Jack Hart corroborated this statement. Hart also said that none of the appellants told him at any time after the August 25 meeting that they did not have an agreement.

Bowman testified about uncompleted business and new prospects that his company had. They were pouring concrete on a road job at Foreman on a contract with Calvin Carter Construction Company on Friday prior to the meeting. Bowman said that he so advised Jack Madden. Jack Madden finished that job, using a vehicle peculiarly suited to the job and obtained from Bowman. Not only did Jack Madden do this but he immediately employed the foreman and principal employee of the company owned by appellees. Jack Madden obtained the truck the next day after the meeting. Bowman said that Madden called and asked if it would be all right if they *went ahead* and got one of the trucks. Bowman testified that Sheldon Madden told him repeatedly after the August 25 meeting that they were going through with the deal if his son still wanted it. Jack Madden continued to use the truck for an extensive period of time and only discontinued its use after being requested to do so by Jack Hart when it seemed apparent that Madden would not carry out the contract. Jack Madden admitted use of the truck for 3 or 4 weeks, and stated that there was never any agreement regarding this use. He admitted that he ceased to use it when one of the appellees told his "batch man" to park it. Sheldon Madden continued to take steps to finance the deal after the meeting. He was reluctant to pay the high interest required for a direct loan at that time but did endeavor to learn whether the SBA loan could be assumed rather than paid. Jack Madden admitted talking on the day after the meeting to appellees' principal employee about going to work for him. This employee did not know what had happened on Monday, August 25, when Madden called. He did go to work for Madden on Wednesday. Sometime between Monday and Wednesday Bowman called this employee, advised him about the prospective use of the truck and asked him if he wanted to operate it for Madden.

These actions of Jack and Sheldon Madden after the meeting of August 25 seem to be clear and convincing evidence that they considered that Jack Madden had entered into a binding contract. Even if this were not sufficient, the evidence clearly calls for application

of the rule, stated but not applied, in *Downtowner* v. *Commonwealth Sec.*, 243 Ark. 122, 419 S. W. 2d 126. There we quoted from Restatement, Contracts, § 72 (2):

> Where the offeree exercises dominion over things which are offered to him, such exercise of dominion in the absence of other circumstances showing a contrary intention is an acceptance. If circumstances indicate that the exercise of dominion is tortious the offeror may at his option treat it as an acceptance, though the offeree manifests an intention not to accept.

I am at a loss to understand the significance of testimony about the SBA loan. If anyone had a right to complain about the inability of the parties to obtain release of the sellers on that loan, it was the appellees, not the appellants. Even so, the evidence seems to me to overwhelmingly show that no conversation about assumption of this loan took place until after the August 25 meeting. Staggs testified that the loans were discussed at the meeting. The instrument he typed made no mention of the SBA loan but did provide for assumption of all obligations of the sellers. He testified that the question of the sellers' being relieved of financial responsibility for this loan was not discussed, to his knowledge. There was no doubt that the SBA loan was part of the purchase price negotiated. Jack Hart said that he understood from Sheldon Madden that the SBA loan was to be retired and that Sheldon Madden had arranged to borrow $50,000 at 9½% but was hoping to get another loan. Bowman testified that he heard no discussion of the SBA loan at the meeting of August 25 except as to its amount. Bell testified that there was no mention at the meeting of the release of the sellers from the SBA loan. He understood that Sheldon Madden had arranged for $46,000 to pay off the SBA loan and other obligations and said that the subject of release of the sellers did not arise until a couple of weeks after the August 25 meeting. He testified that Sheldon Madden came to him and sought to determine the possibility of assuming the SBA loan. He said that Madden told him then that he did not want

to go on with the loan he had arranged for at 9½%. He also stated that the Maddens never indicated to him that they did not intend to go through with the deal until this suit was filed. Bell had tried to get his bank to lend the money for the purchase. Bell told the attorney to whom the sellers went two or three weeks after the August 25 meeting that he believed that an agreement was made on the 25th of August. The attorney testified that, at a meeting called to define the positions of the parties, Bell suggested that the SBA loan might be taken care of by bank financing if the cement plant already owned by Jack Madden were mortgaged to secure it. Priest said that Sheldon Madden thought the necessary money could be borrowed. He recalled discussion of the SBA loan many times, but testified that in no conversation was the necessity of the sellers' names being removed ever discussed. While Sheldon Madden denied having reported that he could borrow $46,000, or any other amount, he admitted that his family put Jack Madden in business by helping with the purchase of the Ashdown Cement Plant and that, while he was not putting up the money, he had a brother-in-law who was financing the new purchase on his (Sheldon Madden's) approval. He also admitted that he had discussed with Jack Madden and Priest prospects of borrowing the money from a couple of insurance companies. He also admitted that it was some two or three weeks after the August 25 meeting when he pursued the question of assuming the SBA loan.

I would affirm the decree as to Priest and Jack Madden, and reverse it as to Sheldon Madden.