CIBA-GEIGY CORPORATION *v*. John ALTER

91-235 834 S.W.2d 136

Supreme Court of Arkansas
Opinion delivered May 26, 1992

428

430

*Faegre & Benson*, by: *Winthrop A. Rockwell* and *Barber, McCaskill, Amsler, Jones & Hale, P.A.*, for appellant.

*McKenna & Cuneo*, by: *Lawrence Ebner* and *Wright, Lindsey & Jennings*, by: *James M. Moody*, for amicus curiae National Agricultural Chemicals Ass'n.

*Winston Bryant*, Att'y Gen., by: *Chad Farris*, Chief Deputy Att'y Gen., and *Charles L. Moulton*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice, John Alter sustained severe injury to his corn crop allegedly as the result of his use of Dual 8E, a herbicide manufactured by Ciba-Geigy, Inc. Alter sued Ciba-Geigy asserting theories of strict liability, negligence, breach of warranty, misrepresentation, and breach of a settlement contract. The jury returned a general verdict of $100,410.51 in Alter's favor. Ciba-Geigy argues the Trial Court abused its discretion by refusing to bifurcate the trial, separating the breach of settlement contract claim from the remaining claims. Ciba-Geigy contends the failure to bifurcate resulted in inadmissible evidence of settlement negotiations coming before the jury. We agree and reverse and remand on this point. Other issues which may arise on retrial will also be addressed.

Dual is a herbicide registered with the Environmental Protection Agency (EPA), and it is widely used by farmers to control weeds and grass. The herbicide was advertised as giving farmers longer control over weeds and grass for a lower price than competitive products. It was "the longer lasting grass herbicide." The advertising materials which were distributed to farmers by

Ciba-Geigy also stated, "Crop injury? You don't have to worry when you use Dual. Gives you peace of mind. That's worth alot."

Dual was accompanied by a "label," consisting of several printed pages, which contained the following language at page five:

### Conditions of Sale and Warranty

\* \* \*

CIBA-GEIGY warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes referred to in the **Directions for Use** subject to the inherent risks referred to above. **CIBA-GEIGY makes no other express or implied warranty of fitness or merchantability or any other express or implied warranty. In no case shall CIBA-GEIGY or the Seller be liable for consequential, special, or indirect damages resulting from the use or handling of this product.**

### Directions for Use

\* \* \*

**FAILURE TO FOLLOW ALL PRECAUTIONS ON THIS LABEL MAY RESULT IN POOR WEED CONTROL, CROP INJURY, OR ILLEGAL RESIDUES.**

The following warning is found in the label in a box at page six:

*Precaution*: Injury may occur following the use of Dual 8E under abnormally high soil moisture conditions during early development of the crop.

In early 1985, Ron Wulfkuhle and John McLeod, two Ciba-Geigy sales representatives, met with several Arkansas County farmers to promote the use of Dual. Alter was present at the meeting. Alter testified the salesmen told him Dual would control weeds longer at a cheaper price than other herbicides. They also said Dual was safe and would not injure a corn crop. Although Wulfkuhle knew that Dual could damage a corn crop if the crop received heavy moisture after planting, he did not tell Alter about that possibility. Hazards associated with Dual use were not

mentioned. Alter testified he generally read the labels accompanying herbicides, but he could not recall whether he read the precautionary language on the Dual label. Alter did not read the Dual advertising materials, but purchased Dual in reliance on the representations made by the salesmen. He began planting his 997.8 acre corn crop on March 19th. A week and a half later Alter applied Dual to the crop. Midway through the Dual application, a heavy rain fell.

Alter noticed severe injury to his corn crop in early May. The greatest injury occurred in the field referred to as Pittman #3. Some corn was simply not coming up, and other plants looked twisted and "buggywhipped." The crops treated with Dual nearest the time of the rainfall were severely injured, but those treated with Dual after the rainfall were not injured.

Alter immediately reported the problem to his herbicide supplier, Martin Gilbert. Gilbert then called Wulfkuhle who came to the Alter farm. Wulfkuhle determined the percentages of injury of the crop in the various fields. He noticed that some fields were 100% injured, and there were others with less than 2% crop injury. Wulfkuhle admitted the damage looked like it had been caused by Dual. Wulfkuhle told Alter to replant his crop and that Ciba-Geigy would pay him $25.00 an acre for replanting costs. Alter replanted 139 acres.

On May 30th, Alter's counsel sent a letter to Ciba-Geigy's main office in Greensboro, North Carolina. Counsel informed Ciba-Geigy of the injury to Alter's crop and demanded compensation for loss of crop yield resulting from the Dual application, as well as replanting costs. Ciba-Geigy responded on June 28th. The response indicated Alter's yield loss would be determined at harvest, and that Wulfkuhle would be checking on the harvest frequently. Ciba-Geigy agreed to pay Alter $25.00 an acre for replanting costs.

Wulfkuhle came to Alter's farm on several occasions to check the harvest. Alter told Wulfkuhle he wanted Ciba-Geigy to pay for his loss of crop yield resulting from the Dual application. He told Wulfkuhle to bring someone to the farm who had the authority to settle the matter. John McLeod, a district manager for Ciba-Geigy, came to the farm with Wulfkuhle in July. Alter testified that during this meeting an agreement was reached on

yield loss compensation.

According to Alter, he, McLeod, and Wulfkuhle agreed that compensation would be determined by utilizing a formula. Alter would first obtain an average yield on his three best fields: Pittman #3, Alter #3, and Alter #15. The average yield would be obtained by using what was referred to as a "random plot method." Alter harvested random plots in his three best fields and obtained an average yield for these plots. Alter testified that McLeod and Wulfkuhle told Alter that Ciba-Geigy would pay the difference between the average yield of the random plots and the balance of the corn crop. The difference would represent Alter's loss of yield resulting from the Dual application. McLeod refused to put the agreement in writing.

Sometime after the July meeting, Alter put the formula into operation. Alter harvested the random plots on his best fields and arrived at an average yield of 159.829 bushels per acre. He subtracted the 105,199.630 bushels he had harvested and arrived at a total loss figure of 54,357.746 bushels. Alter multiplied that figure by the $2.558 selling price per bushel to come up with a dollar crop yield loss of $139,047.11. He added replanting costs and concluded his total loss was $142,522.11. Alter provided the figures toWulfkuhle on October 1st.

Alter stated Wulfkuhle was actively involved in the measuring and harvesting of the random plots. Wulfkuhle did not object to the random plot method. Wulfkuhle testified that neither he nor McLeod made a settlement offer to Alter. He only told Alter that Ciba-Geigy would work with him through the harvest. McLeod did not recall meeting with Alter. Jim LeCroix, who was present during the sales meeting, stated Wulfkuhle told him Ciba-Geigy had agreed on a formula to compensate Alter for his loss of yield. LeCroix stated Alter also told him about Ciba-Geigy's agreement. Martin Gilbert, who sold the Dual to Alter, testified that McLeod and Wulfkuhle had agreed to compensate Alter based on the formula. Alter stated that although no precise dollar figure was agreed upon, everyone agreed on the formula to be used in calculating yield loss.

On October 21, 1985, Alter's counsel again wrote to Ciba-Geigy requesting a settlement. The letter stated that Alter had worked extensively with Wulfkuhle in an effort to resolve the

matter and had provided Wulfkuhle with the necessary documentation on yield loss. No response was received until October 29th when Ciba-Geigy offered Alter $31,036 in damages.

On November 22nd, Alter rejected Ciba-Geigy's offer and counter-offered to settle for $142,522.11. In this letter, Alter indicated that $142,522.11 represented the yield loss as determined by the formula he and McLeod had agreed upon. The letter outlined the formula in detail. Ciba-Geigy replied with an offer of $45,000 which Alter rejected and countered at $110,000. This, his final counter-offer, was rejected by Ciba-Geigy on January 28, 1986, and Alter filed the action underlying this appeal.

The strict liability and negligence theories were premised upon Ciba-Geigy's failure adequately to warn of risks associated with the use of Dual. Alter also requested $2 million dollars in punitive damages. Prior to trial, Ciba-Geigy moved to bifurcate the breach of settlement contract claim from the other claims. The motion was denied, and the case proceeded to trial.

Harper Grimes, a former trouble shooter for Ciba-Geigy, testified that Dual caused the damage in Alter's field. He stated Dual frequently caused damage when the soil was extremely wet or when a substantial rain occurred in a short period of time during or just after application. The critical point for Dual damage was from the time of germination. Grimes did not believe that the precautionary language on the Dual label adequately informed farmers about the risks of rainfall. The warning should have been placed in two locations, and it should have described the conditions of danger more adequately.

Dr. Everett Cowlett, director of technical services for Ciba-Geigy, stated there was a potential for crop injury resulting from Dual use when high moisture conditions occurred within seven days to a month after the seed was planted. Dr. Cowlett admitted a farmer could not determine whether it was safe to apply Dual after planting. The farmer will not know whether there will be an abnormally high moisture condition within seven days to a month after planting. For this reason, Ciba-Geigy put the precautionary language on the label. Dr. Cowlett further stated that the Dual label was approved by the EPA.

Dr. Edward Higgins, an employee of the agricultural division at Ciba-Geigy, stated Dual was safe to use on corn. He stated Ciba-Geigy had conducted several studies and tests on Dual. The tests showed that the type of crop damage Alter experienced occurred in only one-tenth of one percent of cases. Dr. Higgins said the warnings on the Dual label were adequate, and they were like those commonly used in the herbicide industry. Placing the warnings in two places on the label would be burdensome.

The jury returned a general verdict in Alter's favor for $100,410.51 in compensatory damages and no punitive damages.

## I. Bifurcation

■ Ciba-Geigy moved to bifurcate the breach of settlement contract claim from the remaining strict liability, negligence, breach of warranty, and misrepresentation claims. The basis of the motion was that allowing all claims to be tried together would result in the admission of evidence of settlement negotiations which would unfairly prejudice the defense of the claims for liability other than breach of the settlement contract.

Arkansas R. Civ. P. 42(b) provides:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or any number of claims, cross-claims, counterclaims, third-party claims, or issues.

Absent an abuse of discretion, the Trial Court's decision regarding bifurcation will not be reversed. *Transit Homes Inc. v. Bellamy*, 282 Ark. 453, 669 S.W.2d 7 (1984). The purpose of Rule 42(b) is to further convenience, avoid delay and prejudice, and serve the needs of justice. The primary concern is efficient judicial administration, as long as no party suffers prejudice by the bifurcation. *Hunter v. McDaniel Bros. Const. Co.*, 274 Ark. 178, 623 S.W.2d 196 (1981).

In addressing whether the Trial Court abused its discretion by failing to bifurcate the settlement contract claim, we must also examine Ark. R. Evid. 408. In provides, in part:

> Evidence of (1) furnishing, offering, or promising to

furnish, or (2) accepting, offering, or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim.

■ Offers of compromise or settlement are clearly inadmissible to prove a party's liability on the underlying claim. They may, however, be admissible if offered for another purpose. *See, e.g., McKenzie* v. *Tom Gibson Ford, Inc.,* 295 Ark. 326, 749 S.W.2d 653 (1988); *Elrod* v. *G & R Const. Co.,* 275 Ark. 151, 628 S.W.2d 17 (1982).

There was an abundance of testimony about Ciba-Geigy's offers to settle Alter's claim. Alter testified in detail about the settlement negotiations. Alter's counsel stated in closing argument that Ciba-Geigy would not have offered to settle had they not believed liability existed. Although the testimony on settlement negotiations might have been admissible as it related to the breach of settlement contract, it was clearly inadmissible in a trial on the other claims against Ciba-Geigy.

In *Ismail* v. *Cohen,* 706 F.Supp. 243 (S.D.N.Y. 1989), the District Court discussed the circumstances in which prejudice to a party may require separate trials of certain issues. The paramount concern is prejudicing the jury with respect to claim "A" by producing evidence on claim "B" when that evidence is irrelevant to claim "A." *See also Larsen* v. *Powell,* 16 F.R.D. 322 (D. Colo. 1954) (if evidence would be relevant and material to one issue but improper and prejudicial with respect to another, separate consideration of each issue is indicated); 5 *Moore's Federal Practice* § 42.03(1) (1987) (a separate trial may be appropriate where a defendant in a negligence action pleads a release, if the court believes the jury may be prejudiced by trying the issues as to the existence and validity of the release with the issues on the merits).

· ■ Although a combined trial of all claims might have been judicially economical, the prejudice to Ciba-Geigy resulting from the inadmissible evidence coming before the jury was substantial. In no area of the law are we disposed to promote the interests of judicial economy over a party's right to receive a fair trial. Because the only way to avoid unfair prejudice in these

circumstances would have been to bifurcate the breach of settlement contract claim, the Trial Court abused its discretion in failing to do so.

## II. Issues on retrial

### A. FIFRA preemption

Ciba-Geigy argues that the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136-136y (1978), preempts Alter's claims based on inadequate labeling. It is undisputed that Dual is a herbicide registered with the EPA under FIFRA, and that the Dual label has met with EPA approval. The essence of Ciba-Geigy's argument is that, by imposing certain labeling requirements on pesticide manufacturers, Congress intended through FIFRA to preempt state common law tort claims based on the alleged inadequacy of the labels. We disagree and conclude state common law tort claims for inadequate labeling are neither expressly nor impliedly preempted by FIFRA.

### 1. Preemption doctrine

■ The doctrine of federal preemption is based upon the supremacy clause in Article VI, cl. 2, of the United States Constitution. Under the supremacy clause, state laws that "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" are invalid. *Gibbons* v. *Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824). Congressional intent to supplant state authority in a particular field may be express. *Jones* v. *Rath Packing Co.*, 430 U.S. 519 (1977). No case has held that Congress through FIFRA has expressly preempted state common law tort claims. Absent express preemptive language, congressional intent to supersede state law may be implied.

■ Implied preemption can occur in the following circumstances: (1) when the scope of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the state to act, (2) when the state and federal law actually conflict, (3) when compliance with state and federal law is physically impossible, (4) when the state law stands as an obstacle to the accomplishment of the full objectives of Congress.

*See, e.g., Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132 (1963); *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218 (1947).

■ We begin with the assumption that the historic police powers of the states are not to be superseded by a federal act unless that is the clear and manifest purpose of Congress. *Rice* v. *Santa Fe Elevator Corp., supra*, at 230. The burden is on the moving party to prove that Congress intended to preempt state law. *Silkwood* v. *Kerr-McGee Corp.*, 464 U.S. 238 (1984).

### 2. FIFRA requirements

All pesticides, fungicides, and rodenticides must be registered with the EPA before they can be sold in interstate commerce. 7 U.S.C. § 136a. FIFRA directs the EPA Administrator to register a pesticide when its composition is such as to warrant the proposed claims for it, its labeling and other material required to be submitted comply with the requirements of the Act, it will perform its intended function without unreasonable adverse effects on the environment, and when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment. 7 U.S.C. § 136a(c)(5). "Unreasonable adverse effects on the environment" is defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of the pesticide." 7 U.S.C. § 136(bb).

As part of the registration statement, a copy of the pesticide's label is submitted to the EPA for approval. 7 U.S.C. § 136a(c)(1)(C). To obtain EPA approval, the manufacturer must comply with the EPA Labeling Requirements for Pesticides and Devices found in 40 C.F.R. § 156.10 (1991). One requirement is that the pesticide label provide the consumer with warnings or precautionary statements. § 156.10(a)(1)(vii). The warnings must be "clearly legible to a person with normal vision and must be placed with such conspicuousness and expressed in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use." § 156.10(a)(2).

The manufacturer submits its draft label to the EPA for

approval. A manufacturer of some toxic pesticides is required to include "signal words" on the front panel of the label. For example, a manufacturer of a pesticide classified in Toxcicity Category I must include the signal word "Danger" on the front panel. § 156.10(h)(1)(i)(A). When an environmental hazard exists from the pesticide, precautionary language stating the nature of the hazard and the appropriate precautions to avoid potential accident, injury, or damage is required. § 156.10(h)(2)(ii).

In enacting FIFRA, Congress expressly delineated the extent to which states could regulate pesticides. Section 136v provides in part:

> (a) **In general.** A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

> (b) **Uniformity.** Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

FIFRA prohibits a state from imposing through statute or regulation different or additional requirements on pesticide labeling. The question we must answer, however, is whether a state tort claim based on inadequate labeling is also prohibited by FIFRA. Federal district and appellate courts disagree on this issue, and it is an issue of first impression for a state appellate court.

### 3. The Ferebee case

The first case to address the question presented was *Ferebee* v. *Chevron Chemical Co.*, 736 F.2d 1529 (D.C. Cir. 1984). Ferebee contracted pulmonary fibrosis as a result of long-term skin exposure to paraquat, a herbicide manufactured by Chevron. Ferebee's estate brought suit on the ground that Chevron's label failed to warn adequately of the risks associated with paraquat. Addressing the preemption issue, the District of Columbia Circuit first recognized that FIFRA and state tort law served different purposes. The fact that the EPA had determined a label adequate for purposes of FIFRA did not compel a jury to find the

label adequate for purposes of state tort law. The Court stated:

> FIFRA aims at ensuring that, from a cost-benefit point of view, paraquat as labelled does not produce "unreasonable adverse effects on the environment." State tort law, in contrast, may have broader compensatory goals; conceivably, a label may be inadequate under state law if that label, while sufficient under a cost-benefit standard, nonetheless fails to warn against a significant risk.

The Court held that Congress did not explicitly preempt state damage actions but merely precluded the states from directly ordering changes in EPA approved labels. Compliance with federal and state law was not impossible because a manufacturer could either continue to use the EPA approved label and pay damages or petition the EPA to allow the label to be made more comprehensive. State damage actions did not stand as an obstacle to the accomplishment of FIFRA's purposes. In some circumstances, tort recovery could promote legitimate regulatory aims by exposing new dangers associated with pesticides. Successful actions may lead manufacturers to petition the EPA to allow more detailed labeling of their products.

### 4. The Papas case

Other federal appellate decisions have disagreed with the *Ferebee* decision and concluded FIFRA preempts state tort claims. In *Papas* v. *Upjohn Co.*, 926 F.2d 1019 (11th Cir. 1991), Papas was injured from exposure to pesticides manufactured by Upjohn. The three main claims were based on inadequate labeling of the pesticides. The United States Court of Appeals for the Eleventh Circuit held that the EPA had regulated almost every aspect of pesticide labeling, thus leaving no room for the states to supplement federal law by means of state common law tort actions. The Court held that a jury determination that a pesticide's labeling was inadequate was in direct conflict with the EPA's determination that the labeling was sufficient to protect against health risks. The verdict would require the manufacturer to change its EPA approved label, thus destroying the uniformity of labeling that Congress sought to achieve by enacting FIFRA.

The United States Court of Appeals for the Tenth Circuit recently agreed with the *Papas* case rationale in *Arkansas-Platte & Gulf Partnership* v. *Dow Chemical Co.*, 1992 U.S. App. LEXIS 3572 (10th Cir. 1992).

### 5. *This case*

#### a. *Conflict between state and federal laws*

We do not agree that the federal scheme is so pervasive that states are left no room for common law tort claims, even though a state court judgment may have implications affecting the uniformity of labeling hazardous products.

■ Congress expressly recognized the states' continued right to regulate the use of pesticides in Section 136v(a). The fact that states are allowed to regulate the use of EPA label-approved pesticides indicates Congressional recognition of retention in the states of power to control the use of such pesticides by requiring that some resulting injuries be compensated. *Ferebee* v. *Chevron Chemical Co., supra.* The adoption of Section 136v(a) demonstrates that the scheme created by FIFRA is not so pervasive or the federal interest so dominant as to demonstrate an intent to preempt state tort claims.

The more difficult question is whether a tort judgment based on inadequate labeling conflicts with the EPA determination that the label is sufficient. A conflict can occur to the extent compliance with federal and state law is impossible. The *Ferebee* rationale that a manufacturer can comply with both federal and state law by continuing to use the EPA approved label and paying damages to successful plaintiffs has met with sharp, justified criticism. *See, e.g., Fitzgerald* v. *Mallinckrodt, Inc.*, 681 F. Supp. 404 (E.D. Mich. 1987) (a jury verdict effectively compels the manufacturer to alter the warning to conform to different state law requirements). A manufacturer who has to pay damages under state law is obviously not complying with the state law but is being held liable for not complying.

■ The Court in the *Ferebee* case was correct, however, in concluding that after a jury determines a pesticide label to be inadequate the manufacturer can simply petition the EPA to allow the label to be made more comprehensive. By doing so, the manufacturer would be in compliance with state tort law and with

EPA regulations. *See also Riden* v. *ICI Americas, Inc.*, 763 F. Supp. 1500 (W.D. Mo. 1991) (a manufacturer is not "compelled" to alter a label in the same way that it is "compelled" to comply with a state law or regulation).

### b. Uniformity

The final preemption question is whether allowing state damage actions in cases such as this may not be allowed because it would conflict with the congressional purpose of promoting uniform labeling. The argument is that changing the label to conform to a jury verdict would destroy the uniformity that Congress and the EPA sought to achieve in FIFRA. It has been stated that, although broad in scope, the EPA requirements stop short of creating absolute uniformity in pesticide labels. As one court has observed, "the EPA requirements permit labeling variations even among products containing the same active ingredient. Thus, to argue that an adverse jury award would threaten FIFRA's policy of uniform labeling belies the truth." *Riden* v. *ICI Americas, Inc., supra.* The fact that manufacturers submit their own labels implies a duty to provide a label that gives adequate warnings about the risks associated with the product's use notwithstanding the need for EPA approval.

The intent of Congress in enacting FIFRA was to set minimum standards for pesticide labeling. "Federal legislation has traditionally occupied a limited role as the floor of safe conduct; before transforming such legislation into a ceiling on the ability of states to protect their citizens, a court should wait for a clear statement of congressional intent." *Ferebee* v. *Chevron Chemical Co., supra; Cox* v. *Velsicol Chemical Corp.*, 704 F. Supp. 85 (E.D. Pa. 1989).

In conclusion, Ciba-Geigy has failed to overcome the strong presumption that Congress intended to leave intact a states ability to compensate its citizens for injuries resulting from pesticide use. Congress has not occupied the field of pesticide regulation so pervasively as to leave no room for the states to act in the area of tort compensation. There is no conflict between the EPA determination that a label is adequate for purposes of FIFRA and a jury determination that a label is inadequate for purposes of state tort law. Although we do not entirely agree with the *Ferebee* rationale, we agree with the conclusion that FIFRA

and state tort law serve different purposes.

FIFRA seeks to ensure that, from a cost-benefit standpoint, a pesticide does not impose an unreasonable adverse effect on the environment. State tort law seeks to compensate injured parties when a manufacturer fails to give a reasonable and adequate warning of foreseeable dangers in using the product. As the Court pointed out in the *Ferebee* case, a label or warning may be inadequate under state tort law but sufficient under the EPA cost-benefit standard.

Finally, we understand the desirability of uniformity in labeling hazardous products, and we do not doubt that Congress intended to achieve uniform minimum labeling standards by passing the Act. We cannot, however, conceive of a plan by Congress to supplant the laws by which the states recompense, and to a degree protect, their citizens and others from injury resulting from the use of those products. Congress surely did not intend to put in place a system of uniformity in labeling so absolute as to subvert the tort laws of the states.

### B. Breach of settlement contract

Ciba-Geigy argues the Trial Court should have directed a verdict in its favor on the breach of settlement contract claim because the evidence did not show a mutual agreement between the parties and the terms of the settlement contract were too indefinite to be enforced. Ciba-Geigy contends the evidence showed only that the parties were engaging in settlement negotiations and no mutual agreement on compensation was reached.

When asked to review the denial of a motion for a directed verdict, we examine the evidence, along with all reasonable inferences deducible from it, in the light most favorable to the party against whom the motion is sought. *McWilliams* v. *Zedlitz*, 294 Ark. 336, 742 S.W.2d 929 (1988). Only when the proof of one party is so clear, convincing, and irrefutable that no other conclusion could be reached, should the issue be taken from the jury and decided by the court. *Barger* v. *Farrell*, 289 Ark. 252, 711 S.W.2d 773 (1986).

## 1. Mutual assent

 To have a valid contract, all terms should be definitely agreed upon. *Madden* v. *Hart*, 249 Ark. 1054, 463 S.W.2d 352 (1971). It does not follow, however, that the parties must share identical, subjective opinions as to the meanings of the terms. We have held mutual assent can be based on "objective indicator[s] or agreement." *Crain Indus., Inc.* v. *Cass*, 305 Ark. 566, 810 S.W.2d 334 (1991). *See also Dziga* v. *Muradian Business Brokers, Inc.*, 28 Ark. App. 241, 772 S.W.2d 624 (1989).

 Three witnesses testified that sometime in July of 1985 Ciba-Geigy and Alter entered into a binding, mutual agreement on yield loss compensation. In reliance upon this agreement, Alter changed his normal procedures and harvested random plots on his three best fields. Wulfkuhle, an agent for Ciba-Geigy, helped Alter measure and harvest these plots. This evidences objective indications of mutual assent. Although Wulfkuhle later denied the existence of the agreement, the jury was clearly free to disbelieve his testimony in light of the other evidence. *Hodges* v. *Jet Asphalt*, 305 Ark. 466, 808 S.W.2d 775 (1991).

Ciba-Geigy contends the later settlement negotiations show the parties did not intend to be bound in July. An examination of the evidence reveals the opposite conclusion was equally plausible. Alter's subsequent "negotiations" can be interpreted as attempts to get Ciba-Geigy to perform under the terms of the agreed upon formula. The negotiations standing alone do not conclusively show a contract was not formed in July. Although the parties used the terms "offer" and "counter-offer" in their negotiations, one need not necessarily conclude Alter thereby conclusively demonstrated there was no contract. Again, the negotiations could well have been for the purpose of settlement pursuant to the alleged contract.

 Ciba-Geigy also argues the jury concluded no settlement contract existed because the verdict did not correspond to the amount Alter requested under the contract. This issue may not arise upon retrial, but we note it has been held that "a verdict need not correspond in amount to the proof adduced by either party." *Garrison Properties, Inc.* v. *Branton Constr. Co.*, 253 Ark. 441, 486 S.W.2d 672 (1972); *Dickson* v. *Delhi Seed Co.*, 26

Ark. App. 83, 760 S.W.2d 382 (1988).

### 2. Uncertainty

Terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. Restatement (Second) of Contracts, § 33. The law does not favor the destruction of contracts because of uncertainty. *Shibley* v. *White*, 193 Ark. 1048, 104 S.W.2d 461 (1937).

Alter testified in detail about the formula upon which he, Wulfkuhle, and McLeod agreed upon for determining yield loss compensation. Although no precise dollar figure was agreed upon, Alter stated that everyone agreed on the formula to be used in settling the case. From this formula, Alter was able to arrive at a precise dollar figure for yield loss compensation. It is not difficult for us to determine from the formula the amount of damages Alter suffered.

### C. Breach of warranty

Ciba-Geigy also asserts a directed verdict should have been granted in its favor on the breach of express and implied warranty claims because the Dual label effectively disclaimed all warranties, and the label prohibited recovery for consequential damages in the form of lost profits.

To exclude the implied warranty of merchantability, the disclaimer must mention merchantability and be conspicuous. Ark. Code Ann. § 4-2-316(2) (Repl. 1991). To exclude the implied warranty of fitness, the exclusion must be in writing and conspicuous. § 4-2-316(2). Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit the warranty shall be construed wherever reasonable as consistent with each other; but negation or limitation is inoperative to the extent that such construction is unreasonable. § 4-2-316(1). Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable, or the limited remedy fails of its essential purpose. Ark. Code Ann. § 4-2-719(2) and (3) (Repl. 1991).

### 1. Disclaimer of warranties

We do not decide the question, but we note a factual issue with respect to the implied warranties claim. The language on the Ciba-Geigy label could have been effective to disclaim all implied warranties under § 4-2-316(2). The disclaimer was in bold type on page five of the label and clearly mentioned merchantability. The Uniform Commercial Code defines "conspicuous" as being "written in that a reasonable person against whom it is to operate ought to have noticed it. Language in the body of a form is conspicuous if it is in larger or other contrasting type or color." Ark. Code Ann. § 4-12-201(10) (Repl. 1991); *Walker Ford Sales et. al.* v. *Gaither*, 265 Ark. 275, 578 S.W.2d 23 (1979).

The next question is whether Ciba-Geigy's express warranties and the disclaimer of all express warranties can be reasonably construed as consistent with each other under § 4-2-316(1). If they cannot, the disclaimer is ineffective. First to be examined is the nature of the express warranties Ciba-Geigy made to Alter. "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Ark. Code Ann. § 4-2-313(1)(a) (Repl. 1991). An affirmation of the seller's opinion or commendation does not create an express warranty. Ark. Code Ann. § 4-2-313(2) (Repl. 1991).

The advertising materials distributed to farmers by Ciba-Geigy contained an express warranty that a farmer need not worry about crop injury when using Dual. Alter, however, did not recall reading any of the advertising materials. An affirmation of fact must be part of the basis of the parties bargain to be an express warranty. *See Currier* v. *Spencer*, 299 Ark. 182, 772 S.W.2d 309 (1989). When a buyer is not influenced by the statement in making his or her purchase, the statement is not a basis of the bargain. *See generally American Law of Warranties* § 2:7 (1991). Clearly, Alter was not influenced by the advertising materials when purchasing Dual, and hence they were not a basis of the bargain.

There was testimony that Wulfkuhle and McLeod told Alter during the sales meeting that Dual was safe and would not injure a corn crop. The question is whether this was a mere

statement of opinion. In the misrepresentation context, we indicated "an opinion is merely an assertion of one man's belief as to a fact." *Grendell* v. *Kiehl*, 291 Ark. 228, 723 S.W.2d 830 (1987), citing *Prosser & Keeton on Torts* (5th Ed.), Ch. 19 § 109 (1984). There are no set criteria to help ascertain opinion from affirmation of fact, and the determination must be made on a case-by-case basis. *Williston on Sales*, § 17-6 (4th ed. 1974).

▮ The evidence before the Trial Court supported the conclusion that Ciba-Geigy's statements that Dual was safe and would not injure a corn crop were affirmations of fact and not mere opinions or commendations. The jury had sufficient evidence to conclude the statements were not "sales puffing" and constituted specific express warranties that the goods would conform to the affirmations. *See, e.g., Pritchard* v. *Liggett & Myers Tobacco Co.*, 295 F.2d 292 (3rd. Cir. 1961) (if a manufacturer assures the public that his product is safe when in fact it is harmful, he can "no doubt" be held liable for breach of warranty); *American Law of Warranties* § 2:57 (1991) (a statement that a product is safe is generally an absolute undertaking that it is so). Again, we do not decide the issue, but we note that if the evidence is the same on retrial, a jury could conclude the disclaimer ineffective. *Walcott & Steele* v. *Carpenter*, 246 Ark. 95, 436 S.W.2d 820 (1969).

### 2. Limitation of remedies

▮ A seller of goods may limit the buyer's remedies for breach of warranty pursuant to Ark. Code Ann. § 4-2-719(1)(a) (Repl. 1991). A limitation of remedies provision restricts the remedies available to the buyer once a breach of warranty is established. An otherwise valid limitation of remedy is avoided by the buyer if the limitation fails of its essential purpose, *Great Dane Trailer Sales, Inc.* v. *Prysock*, 301 Ark. 436, 785 S.W.2d 13 (1990), or is unconscionable. § 4-2-719(3).

▮ The "failure of essential purpose" exception is most commonly applied when the buyer's remedy is exclusively limited to repair or replacement of defective goods, and the seller is unable to repair or replace the goods to conform to the warranty. *See, e.g., Great Dane Trailer Sales, Inc.* v. *Prysock, supra; Walker Ford Sales et. al.* v. *Gaither, supra.* In this case, we are not dealing with a seller who failed to correct a defect after being

asked to do so by the buyer, and the failure of essential purpose exception is not applicable. *See Hill* v. *BASF Wyandotte Corp.*, 696 F.2d 287 (4th Cir. 1982). Ciba-Geigy has not limited or substituted Alter's remedy to repair or replacement of the defective goods and has only limited its liability for consequential damages.

 While we cannot definitely resolve the issue, some comment on whether the limitation on consequential damages was unconscionable and unenforceable under § 4-2-719(3) is appropriate. Unconscionability must be determined in light of general commercial background, commercial needs in the trade or the particular case, the relative bargaining positions of the parties, and other circumstances existing when the contract was made. *Kohlenberger* v. *Tyson's Foods*, 256 Ark. 584, 510 S.W.2d 555 (1974). The commentary to § 4-2-719 states "it is of the very essence of a sales contract that at least minimum adequate remedies be available."

In *Dessert Seed Co.* v. *Drew Farmers Supply*, 248 Ark. 858, 454 S.W.2d 307 (1970), we held a limitation of liability clause unreasonable, unconscionable, and against public policy when negligence of the seller was clearly established, and the buyer was unable to discover the defect in the goods. *See also Latimer* v. *William Mueller & Son, Inc.*, 149 Mich. App. 620, 386 N.W.2d 618 (1986) (limitation of remedy unconscionable when the defect could not be discovered); *Majors* v. *Kalo Laboratories, Inc.*, 407 F. Supp. 20 (N.D. Ala. 1975) (limitation of remedy unconscionable when a latent defect is involved). Because other evidence might be presented on this issue on retrial, we cannot pass on the unconscionability question on this appeal. *Kohlenberger* v. *Tyson's Foods, supra.*

### D. Punitive damages

 Ciba-Geigy argues that, although no liability for punitive damages was imposed, the issue of punitive damages and evidence of financial condition should not have been submitted to the jury. Ciba-Geigy fails to mention that the jury was instructed on the tort of deceit. Although we do not know the basis of the general verdict in this case, punitive damages are available in cases of misrepresentation or deceit. *Stein* v. *Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992); *Thomas Auto Co.* v. *Craft*, 297 Ark.

492, 763 S.W.2d 651 (1989). If there is substantial evidence to show deliberate misrepresentation or deceit the issue of punitive damages may be submitted to the jury. *Stein* v. *Lukas, supra.*

### E. Prejudgment interest

 Ciba-Geigy's final point is that the Trial Court erred by awarding Alter prejudgment interest because the amount of damages was not ascertainable at the time of injury. The Trial Court awarded Alter prejudgment interest at the rate of six percent beginning on November 22, 1985, through March 19, 1991. In cases where damages cannot be ascertained at the time of the loss, prejudgment interest should not be allowed. The damages must be capable of exact determination as to time of accrual and amount. *Lovell* v. *Marianna Fed. S & L Assn.*, 267 Ark. 164, 589 S.W.2d 577 (1979). In this case, Alter's damages from the use of Dual were not capable of exact determination until harvest. The Trial Court's award of prejudgment interest was only for damages accrued after Alter provided Ciba-Geigy with all necessary harvest figures. At that time, damages were capable of exact determination, and the prejudgment interest award was not error.

Reversed and remanded.