COMPAQ COMPUTER
CORPORATION,
Petitioner,

v.

Hal LAPRAY, et al., Respondents.

No. 02-0705.

Supreme Court of Texas.

Argued Oct. 15, 2003.

Decided May 7, 2004.

---

James J. Scheske, Akin Gump Strauss Hauer & Feld LLP, Austin, for Amicus Curiae Emachines, Inc.

Roger Higgins, Thompson Coe Cousins and Irons, Dallas, for Amicus Curiae National Association of Independence.

Lynne Liberato, Haynes and Boone, LLP, Houston, for Amicus Curiae Packard Bell Nec, Inc., et al.

Sara Murray, Langley & Banack, Inc., San Antonio, for Amicus Curiae Texas Association of Business.

Luther H. Soules III, Soules & Wallace, San Antonio, for Amicus Curiae Civil Justice League.

David Bates, Gardere Wynne Sewell, LLP, Houston, for Amicus Curiae Texas The American Chemistry Council.

William A. Worthington, Strasburger & Price, Houston, for Amicus Curiae The Product Liability Advisory.

Tanner T. Hunt Jr., Wells Peyton Greenberg & Hunt, Beaumont, Peter M. Stone, Paul Hastings Janofsky & Walker, LLP, Costa Mesa, CA, for Amicus Curiae Trigem Computer, Inc.

Ruth G. Malinas, Ball & Weed, P.C., San Antonio, for Amicus Curiae United Services Automobile Ass'n.

James J. Lee, Vinson & Elkins, L.L.P., Dallas, Gene M. Williams, Mehaffy & Weber, Beaumont, Michael Holston, John Schultz, Drinker Biddle & Reath, Philadelphia, PA, for other interested parties.

David J. Beck, Alistair B. Dawson, David M. Gunn, Anne Pike, Beck Redden & Secrest, L.L.P., Houston, Carl Allen Parker, Parker & Parks, L.L.P., Port Arthur, Robert Q. Keith, Keith & Weber, Johnson City, Sheila Birnbaum, Barbara Wrubel, J. Russell Jackson, Skadden Arps Slate Meagher & Flom, LLP, New York, NY, for Petitioner.

Wayne Reaud, The Reaud Law Firm, Beaumont, for Respondent Hal Lapray.

Jack Carroll, D. Allan Jones, Gilbert I. "Buddy" Low, Gary Neale Reger, Orgain Bell & Tucker, L.L.P., Charles K. Kebodeaux, Law Office of Keith Kebodeaux, Larry De–Wayne Layfield, Law Office of L. DeWayne Layfield, Hubert Oxford III, Benckenstein & Oxford, L.L.P., Beaumont, Charles M. Silver, Austin, for Respondent Tracy D. Wilson, Jr.

Justice JEFFERSON delivered the opinion of the Court.

Plaintiffs Hal Lapray, Tracy D. Wilson, Jr., and Alisha Seale Owens, on behalf of themselves and all others similarly situated, sued Compaq Computer Corporation alleging that Compaq sold them computers containing defective floppy disk controllers ("FDCs"). The trial court certified a nationwide class under Rule 42(b)(2) and (b)(3)[1], Tex.R. Civ. P., and the court of appeals affirmed. For the reasons set forth below, we reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion.

# I
## Factual Background

Plaintiffs allege that the affected computers, some thirty-seven models of Compaq Presario computers, contain defective FDCs. FDCs control the transfer of data (broken down into individual characters called "bytes") between a computer's memory and a floppy disk. Plaintiffs claim that, in certain circumstances, computer system "latencies"[2] can lead the FDC to fail to identify that data has been written incorrectly to the floppy disk—a condition called an "underreported underrun"—resulting in the loss of a byte of data. The plaintiffs allege that the FDCs failed to meet industry standards adopted by Compaq and that Compaq identified the FDC problem as a "failure" of a "main feature" but elected to sell the computers anyway. Plaintiffs assert that the defective FDCs breached Compaq's limited warranty, which promised that the computers would be free from defects in materials or workmanship under normal use during the warranty period and that Compaq would repair or replace defective parts.

Lapray et al. sued Compaq, first in federal court then, after the federal court dismissed the claims without prejudice[3], in

---

**1.** Actually, the trial court (by order dated July 23, 2001) certified the class pursuant to Rule 42(b)(2) and (b)(4). Effective January 1, 2004, however, subparagraph (b)(3) was deleted from Rule 42, and former subparagraph (b)(4)—with minor changes not pertinent to our decision—is now (b)(3). Compare TEX.R. CIV. P. 42 and TEX.R. CIV. P. 42 General Commentary—2003 ("Subparagraph (b)(3) is omitted as unnecessary.") with TEX.R. CIV. P. 42, 553–554 S.W.2d (Tex.Cases) XXXVI–XXXVIII (1977, amended 2004). For ease of reference, we will refer herein to (b)(3), and those references will include former subparagraph (b)(4). As amended, Rule 42(b)'s subsections are now numbered the same as Federal Rule of Civil Procedure 23(b). See FED. R.CIV.P. 23(b). We note too that, on remand, the trial court proceedings will be governed

by the amended rule. See Ex Parte Abell, 613 S.W.2d 255, 260–61 (Tex.1981).

**2.** A "latency" in this context is a delay: the amount of time it takes a byte of data to travel from one point to another on the computer motherboard.

**3.** The federal district court granted Compaq's motion for summary judgment on plaintiffs' sole federal claim, holding that none of the three named plaintiffs met the $5,000 minimum damage requirement to state a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Thurmond v. Compaq Computer Corp., 171 F.Supp.2d 667, 684 (E.D.Tex. 2001). That court then declined to exercise supplemental jurisdiction over the remaining state claims and dismissed those claims without prejudice to refiling in state court. Id.

the 60th judicial district court in Jefferson County. Having abandoned their other causes of action, the plaintiffs allege only that Compaq breached its express warranty. The plaintiffs seek a declaration that (i) Compaq breached its express warranty, (ii) Compaq breached its obligation to repair, replace, or refund, (iii) the FDC defect is covered by Compaq's express warranty, and (iv) class members have a right to seek relief under the warranty. In the alternative, they seek damages, either in the form of a refund, the difference in value between a computer without the FDC defect and the computer as purchased, or damages for breach of the duty to repair or replace. Plaintiffs explicitly disclaim consequential damages from loss or corruption of data.

After a hearing on the plaintiffs' motion for class certification, the trial court certified a national class consisting of some 1.8 million computer buyers, including:

All residents and citizens of the United States, other than those excluded below, who purchased from Compaq or from an authorized Compaq reseller any Compaq computer model that contains a SiS 6801 or ITE 8661 FDC, which are identified as being Presario desktop model numbers 2266, 2275, 2281, 2285V, 2286, 2412ES, 2416ES, 5070, 5184, 5185, 5301, 5304, 5304b, 5340, 5345, 5360, 5365, 5410, 5440, 5441, 5451, 5452, 5460, 5461, 5465, and 5710, Presario laptop model numbers 17XL2, 17XL266, 17XL274, 17XL264, 17XL266, 17XL260, 17XL261, 17XL262, 17XL275, 17XL265, and 1700T[CTO].

The following persons are excluded from the class:

All government entities, bodies and agencies of any character, federal, state, or local, and their employees (in that capacity only); the presiding judge(s) and other court personnel, the Named Defendants and their employees.

Finding that the requirements of both Rule 42(b)(2) and (b)(3) were met, the trial court certified the class under both subsections. Additionally, the trial court concluded that it would "likely" apply Texas law to all class members' claims but deferred a final choice-of-law determination. The lengthy certification order includes findings of fact and conclusions of law, as well as a trial plan for the (b)(3) claims.

The court of appeals affirmed the trial court's certification order. 79 S.W.3d 779, 794. The court analyzed the trial court's certification of a (b)(2) class and held that declaratory relief was appropriate. The court of appeals then concluded that "[b]ecause the trial court certified the class under Rule 42(b)(2), and only alternatively certified the class under Rule 42(b)[ (3) ], and having found the trial court did not abuse its discretion in certifying a (b)(3) [sic] class, it is unnecessary to address issues five and six challenging the requirements of predominance and superiority." *Id.* at 791.

## II

### Jurisdiction

██ Because this is an interlocutory appeal from an order certifying a class action and there was no dissent in the court of appeals, this Court has jurisdiction only when the court of appeals "holds differently from a prior decision of another court of appeals or of the supreme court." TEX. GOVT CODE §§ 22.225(b)(3), (c), 22.001(a)(2).[4] Compaq argues that the

---

4. In 2003, the Legislature amended Government Code sections 22.001 and 22.225, but those changes do not govern this appeal. *See* TEX. GOV'T CODE §§ 22.001, 22.225 histori-

cal note (Vernon 2004) [Act of June 11, 2003, 78th Leg., R.S., ch. 204, §§ 1.05, 23.02(a) and (d), 2003 Tex. Gen. Laws 850, 898–99 ("H.B.4") ].

court of appeals' failure to analyze predominance and superiority conflicts with *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425 (Tex.2000). We agree.

■ In *Bernal*, we held that "[c]ourts must perform a 'rigorous analysis' before ruling on class certification to determine whether *all* prerequisites to certification have been met." *Id.* at 435 (emphasis added). Rule 42(b)(3) requires that the trial court find that "questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy." TEX.R. CIV. P. 42(b)(3) (emphasis added). Predominance and superiority analyses are vital to a determination of whether to certify a (b)(3) class. Indeed, predominance is "one of the most stringent prerequisites to class certification." *Bernal*, 22 S.W.3d at 433.

The court of appeals stated that "the trial court certified the class under Rule 42(b)(2), and only alternatively certified the class under Rule 42(b)[ (3) ], and having found the trial court did not abuse its discretion in certifying a (b)(3) [sic] class, it is unnecessary to address issues five and six challenging the requirements of predominance and superiority."[5] 79 S.W.3d at 791. Thus, the court of appeals addressed only the (b)(2) issues but then affirmed the trial court's order (which certified both (b)(2) and (b)(3) classes) in its entirety. *Id.* at 794. The effect of the court of appeals' decision is to affirm the (b)(3) class without reviewing predominance and superiority. The class would be entitled to seek damages under the (b)(3) certification—as affirmed by the court of appeals—without any court ever having rigorously analyzed predominance and superiority. This directly conflicts with *Bernal*—a conflict that is apparent from the face of the court of appeals' opinion—and would operate to overrule it had the opinion issued from our court. *See Coastal Corp. v. Garza*, 979 S.W.2d 318, 319–20 (Tex.1998); *Hill v. Miller*, 714 S.W.2d 313, 315 (Tex. 1986). Accordingly, we have jurisdiction over this interlocutory appeal.

## III

### (b)(2) versus (b)(3) Class Actions

The parties devote much energy and attention to whether this class properly falls under subsection (b)(2) or (b)(3) of rule 42, Tex.R. Civ. P. Compaq argues that the breach of warranty declaratory judgment claim is merely a predicate to a claim for damages and an attempt to "shoehorn" a damages claim into a (b)(2) claim for declaratory relief. Plaintiffs respond that

---

5. This statement is itself inaccurate. In fact, the trial court certified both a (b)(2) and a (b)(3) class. The class certification order states that: "[e]ach of the certification elements under both TRCP 42(b)(2) and TRCP 42(b)[ (3) ] are satisfied"; "the request to certify a (b)(2) class is granted"; "the Court finds that the requirements for (b)[ (3) ] certification are met in this case and certifies a (b)[ (3) ] class"; "it is appropriate to certify both a 42(b)(2) and a 42(b)[ (3) ] class"; and "[t]he Court finds that a national class of all affected models is certifiable under both TRCP (b)(2) and TRCP 42(b)[ (3) ]." Moreover, the trial court noted that the two classes were substantively different: "the damages claim for breach [the (b)(3) class] does not overlap the claim for declaratory relief [the (b)(2) class]." The court further explained that if it were to grant summary judgment on the damages claim, *"such a ruling would not dispose of Named Plaintiffs' claim for declaratory judgment."* (Emphasis in original.) Contrary to the court of appeals statement, however, nowhere does the trial court state that it is certifying the (b)(3) class only in the alternative. Plaintiffs admitted as much in their court of appeals' brief: "What the trial court did is certify the whole case and all remedies under both 42(b)(2) and TRCP 42(b)[ (3) ]."

(b)(2) certification is proper because they have disclaimed consequential damages and primarily seek a declaration that the FDC is defective and falls within Compaq's limited warranty.

Rule 42(b)(2) provides that:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . .

TEX.R. CIV. P. 42(b)(2). The Texas rule derives from its federal parallel, Rule 23(b)(2), and reads identically. TEX.R. CIV. P. 42 historical note (Vernon 1979) ("Subdivision (b)(2) is copied from revised federal rule 23(b)(2).").

"Subdivision (b)(2) was added to [the federal rules] in 1966 primarily to facilitate the bringing of class actions in the civil rights area." *Kincade v. Gen. Tire & Rubber Co.,* 635 F.2d 501, 506 n. 6 (5th Cir.1981) (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice & Procedure § 1775 at 470–71 (2d ed.1986)) [6]. "Before its adoption, the rules made no explicit reference to class actions involving injunctive or declaratory relief, and 'there was some uncertainty whether a class action seeking one of those remedies was an appropriate device for vindicating civil rights.'" *In re Monumental Life Ins. Co.,* 365 F.3d 408, 417 n. 16 (5th Cir.2004) (quoting WRIGHT, MILLER & KANE, *supra,* § 1775, at 470 (2d ed.1986)). Commentators have observed:

Much of the popularization of the Rule 23(b)(2)-type class action was accom-plished in the late 1960s and early 1970s by legal services and other government and foundation-subsidized public interest attorneys, who sought to utilize this type of action as an inexpensive and powerful tool to provide representation for large numbers of indigent and minority persons who previously could secure little effective redress under the legal system. More recently, private counsel have been filing Rule 23(b)(2) class actions with increasing frequency in employment, civil rights, antitrust, environmental, securities, and other types of class litigation.

ALBA CONTE AND HERBERT B. NEWBERG, 2 NEWBERG ON CLASS ACTIONS 62–66 (2003) (citations omitted).

There are procedural distinctions between (b)(2) and (b)(3) class actions. While individual notice is required for classes certified under (b)(3), (b)(2) does not mandate individual notice. Additionally, rule 42(c)(2) provides that class members in a (b)(3) class are entitled to an opportunity to exclude themselves from the class and the preclusive effect of any judgment by "opting out" of the lawsuit. TEX.R. CIV. P. 42(c)(2); *see also Eubanks v. Billington,* 110 F.3d 87, 92 (D.C.Cir. 1997). The rule has no comparable provision for (b)(1) and (b)(2) classes. These distinctions have resulted in much legal wrangling over whether a class is appropriately certified under (b)(2) or (b)(3). As the Fifth Circuit noted, "plaintiffs may attempt to shoehorn damages actions into the Rule 23(b)(2) framework, depriving class members of notice and opt-out protections. The incentives to do so are large. Plaintiffs' counsel effectively gathers clients—often thousands of clients—by a certification under (b)(2). Defendants

---

**6.** Texas Rule of Civil Procedure 42 is patterned after Federal Rule of Civil Procedure 23; consequently, federal decisions and au-thorities interpreting current federal class action requirements are persuasive authority. *Bernal,* 22 S.W.3d at 433.

attempting to purchase res judicata may prefer certification under (b)(2) over (b)(3)."[7] *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir.2000)(footnote omitted).

The rule is silent on whether damages are available in a (b)(2) class. The Federal Rules Advisory Committee apparently contemplated the possibility and stated that (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." FED.R.CIV.P. 23(b)(2) advisory committee's note (1966 amendment). The "predominantly" requirement (not to be confused with (b)(3)'s "predominance" requirement) has engendered some debate. The Fifth, Seventh, and Eleventh Circuits have held that claims for monetary relief predominate over equitable claims unless the monetary relief sought is incidental to the requested injunctive relief. *See Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir.2001); *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir.1999); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir.1998). On the other hand, the Second and Ninth Circuits have rejected this approach in favor of an ad hoc balancing to determine whether (b)(2) certification is appropriate under the circumstances. *Molski v. Gleich*, 318 F.3d 937, 949–50 (9th Cir.2003); *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir.2001).

The United States Supreme Court has not yet decided whether a (b)(2) mandatory class can include claims for monetary relief. Since 1966, when the Advisory Committee penned its note, the Supreme Court regularly has emphasized the importance of allowing affected persons to opt out of representative suits. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 847–48,

119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *S. Cent. Bell Tel. Co. v. Alabama*, 526 U.S. 160, 167–68, 119 S.Ct. 1180, 143 L.Ed.2d 258 (1999); *Richards v. Jefferson County*, 517 U.S. 793, 799–802, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *see also Jefferson*, 195 F.3d at 897. In recent years, it has demonstrated growing concern regarding the certification of mandatory classes when monetary damages are involved. *See Ortiz*, 527 U.S. at 844–48, 119 S.Ct. 2295; *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121, 114 S.Ct. 1359, 128 L.Ed.2d 33 (1994). In fact, the Supreme Court has stated that there is "at least a substantial possibility" that actions seeking monetary damages are certifiable only under (b)(3), which provides class members notice and the right to opt-out. *Ticor Title*, 511 U.S. at 121, 114 S.Ct. 1359. The Fifth Circuit "recognize[d] that the Supreme Court's decision in [*Ticor Title* ] casts doubt on the proposition that class actions seeking money damages can be certified under Rule 23(b)(2)" and stated that "[w]ere we writing on a clean slate, we might give further consideration to the extent to which monetary relief is available at all in 23(b)(2) class actions. However, in the absence of a clearer statement by the Supreme Court or en banc reconsideration of the issue, this panel is bound by circuit precedent." *Allison*, 151 F.3d at 411 n. 3; *see also Coleman v. GMAC*, 296 F.3d 443, 447 (6th Cir.2002) (expressing doubt that damages can be awarded in a (b)(2) class but declining to decide the issue). The Seventh Circuit noted that, in *Ortiz*, "[t]he Supreme Court stressed that proper interpretation of Rule 23, principles of sound judicial management, and constitutional considerations (due process and jury trial),

---

**7.** Still another motivation for seeking (b)(2) certification, addressed below, may be the perception that (b)(2) class representatives

need not satisfy *Bernal's* "rigorous analysis" requirements.

all lead to the conclusion that in actions for money damages class members are entitled to personal notice and an opportunity to opt out." [8] *Jefferson,* 195 F.3d at 898.

The D.C. Circuit recently examined the development of (b)(2) class actions and whether notice and opt-out are appropriate in such cases:

> [A]s one commentator has noted, "as has become increasingly apparent since 1966, these amendments [authorizing injunctive and declaratory relief] created an awkward mismatch between the subdivisions under which class actions are certified and the procedural protections to which a class is entitled." George Rutherglen, *Better Late Than Never: Notice and Opt Out at the Settlement Stage of Class Actions,* 71 N.Y.U. L.REV. 250, 260 (1996). This commentator has observed that "the Advisory Committee foresaw neither the surge in filings of Title VII class actions nor decisions that award individual compensatory relief based on findings of classwide discrimination." George Rutherglen, *Notice, Scope and Preclusion in Title VII Class Actions,* 69 VA. L.REV. 11, 25 (1983). Consequently, this commentator concludes, the Advisory Committee did not address the need for notice in Title VII class actions seeking compensatory as well as injunctive relief. *Id.; see also* WRIGHT, *supra,* § 1776, at 495. The Advisory Committee's lack of foresight in this regard may also explain Rule 23's failure to address the possible need for opt-out rights in non-(b)(3) actions. Several commentators have suggested that, despite the absence of any such requirement in Rule 23, where class members seek individual compensatory relief in addition to broad classwide injunctive relief, it is appropriate for a court to afford them the procedural pro-

tections of notice and an opportunity to opt out. NEWBERG & CONTE, *supra,* § 4.15, at 4–51 to 4–52; Rutherglen, *Notice and Opt–Out, supra,* 71 N.Y.U. L.REV. at 274.

*Eubanks v. Billington,* 110 F.3d 87, 93 (D.C.Cir.1997).

Perhaps as a result of these concerns, recent decisions seem almost to conflate the (b)(2) and (b)(3) subsections. For example, the Seventh Circuit, noting that "[i]t is an open question in this circuit—and in the Supreme Court—whether rule 23(b)(2) ever may be used to certify a no-notice, no opt-out class when compensatory or punitive damages are in issue," has announced three alternatives to a straight (b)(2) certification for cases that combine equitable or declaratory relief with money damages. *Jefferson,* 195 F.3d at 898. First, the trial court may certify the class under (b)(3) for all proceedings. *Id.* at 898. Second, the trial court could make a "divided certification," certifying a (b)(2) class for the equitable portion of the case and a (b)(3) class for the damages portion. Under that scenario, the court noted that the Seventh Amendment right to a jury trial would require adjudication of the (b)(3) claims before the (b)(2) claims, "even if adjudication of these claims decides the equitable claims as well." *Lemon v. Int'l Union of Operating Eng'rs,* 216 F.3d 577 (7th Cir.2000) (citing *Jefferson,* 195 F.3d at 898). The third option discussed in *Jefferson* is that the trial court might certify the class under (b)(2) for both monetary and equitable remedies but exercise its plenary authority to require individual notice and opt-out, "as though the class was certified under Rule 23(b)(3)." *Id.* In a similar vein, the D.C. Circuit has noted, in the context of a Title VII claim, "cases seeking individual monetary damages as well as

---

**8.** Although *Ortiz* involved a (b)(1) class, "these concerns would be applicable to any mandatory class, whether under Rule 23(b)(1) or (b)(2)." *Molski,* 318 F.3d at 949 n. 13.

classwide injunctive relief may be equally amenable to certification as (b)(3) actions, and 'the arguments supporting certification exclusively under subdivision (b)(2) are surprisingly weak.'" *Eubanks,* 110 F.3d at 93 n. 9 (quoting George Rutherglen, *Notice, Scope and Preclusion in Title VII Class Actions,* 69 VA. L.REV. 11, 24 (1983)).

Under each of these scenarios, the net effect is that notice and opt-out would be provided to class members, thereby satisfying due process requirements. Once notice and opt-out are provided, however, (b)(2) classes become virtually indistinguishable from (b)(3) classes.[9] The Fifth Circuit recently recognized as much, noting that arguing over whether certification is proper under (b)(2) versus (b)(3) is a waste of resources. *In re Monumental Life Ins. Co.,* 365 F.3d 408 (5th Cir.2004). In that case, African–American policyholders sued three life insurance companies, alleging that the companies discriminated against them in the sale and administration of low-value life insurance policies. The plaintiffs moved for class certification under Rule 23(b)(2). Finding that plaintiffs' claims for monetary relief predominated over their claims for injunctive relief, the district court held that (b)(2) certification was inappropriate and refused to certify the class.

The Fifth Circuit reversed, noting "the futility of the district court's and the dissent's inquiry as to whether the 'prime goal' of the class is injunctive or monetary relief":

> The rule 23(b)(2) predominance requirement, by focusing on uniform relief flowing from defendants' liability, "serves essentially the same functions as the procedural safeguards and efficiency and manageability standards mandated in (b)(3) class actions." *Allison,* 151 F.3d at 414–15. Therefore, to deny certification on the basis that the damage claims would be better brought as a rule 23(b)(3) class serves no function other than to elevate form over substance. Indeed, interests of judicial economy are best served by resolving plaintiffs' claims for injunctive and monetary relief together.

*Id.* at 417–18. The court then concluded that (b)(2) and (b)(3) "may work in tandem," noting that "[r]ule 23(b)(2) was adopted to facilitate the use of injunctive relief, not to compartmentalize claims for damages under rule 23(b)(3)." *Id.* at 417 n. 16 (citing WRIGHT & MILLER, *supra,* § 1775, at 470–71). Thus, the court reversed the trial court's order denying class certification and remanded the matter for further proceedings, noting that "[u]nder our precedent, should the class be certified on remand, class members must be provided adequate notice, and the district court should consider the possibility of opt-out rights."[10] *Id.* at 417.

■ Accordingly, rather than focus on whether monetary relief predominates, or whether injunctive or declaratory relief will be necessary at some point, we hold that trial courts considering certification under (b)(2) must consider, and due process may require, individual notice and opt-out rights to class members who seek monetary damages under any theory. This conforms to United States Supreme Court guidance and discourages parties from artful pleading to circumvent what are perceived as stricter certification requirements under (b)(3). We recognize that (b)(2) played—and still plays—a valu-

---

9. As discussed more fully below, (b)(2)'s cohesiveness requirement parallels the predominance and superiority requirements of (b)(3).

10. Fifth Circuit precedent requires notice if a (b)(2) class seeks monetary relief. *Monumental Life,* 365 F.3d at 417 n. 15.

able role in class action litigation. As used initially, primarily to stop classwide illegal treatment in the civil rights arena, (b)(2) filled a void that (b)(3) did not. With the evolution of the caselaw, the acceptance of the idea that injunctive or declaratory relief is available even under (b)(3), and the United States Supreme Court's growing concern about mandatory classes that include damages, however, a mandatory (b)(2) consumer class may deprive its members of due process rights.

In this case, the trial court certified a (b)(2) declaratory relief class "which, if granted, would lead to enforcement of the remedies permitted by the written warranty (of repair, replacement or refund)." The court then separately certified under (b)(2) "the counts for declaratory relief and breach of warranty that Compaq argues could become a predicate for money damages outside the four corners of the written warranty (money damages for, alternatively, breach by sale and breach by failure to repair)." As to the second (b)(2) class, the trial court noted that it understood that there was "the prospect for recovery of money damages within a TRCP 42(b)(2) class" but that "the declaratory relief sought . . . is not mere incidental baggage to the claim for money damages. . . ." The trial court also certified both the declaratory relief and the damage claims under (b)(3). Thus, all claims and all remedies were certified under both (b)(2) and (b)(3).

While the (b)(3) class would be automatically entitled to notice and opt-out, the trial court failed to even examine the possibility of notice and opt-out for the (b)(2) class.[11] In light of the concerns outlined above, we are reluctant to affirm a (b)(2) class that includes claims for damages without the concomitant protections afforded by notice and opt-out, and we cannot do so without knowing whether class members will be provided these protections. This is particularly true when, as here, the class has disclaimed consequential damages. If, in fact, some purchasers suffered such damages, their inclusion in a mandatory class may be improper; that is, due process may require that they be given notice of the class action and an opportunity to opt out and preserve their claims. In this case, the trial court wholly failed to address notice and opt-out rights for (b)(2) class members.[12] Because notice and opt-out must be determined before the parties can ascertain what their respective rights will be, an appellate court cannot effectively review a certification order that does not state how, if at all, these rights will be provided. While we cannot say that no (b)(2) class can be certified absent notice and opt-out rights to class members, we can state that, if damage claims are implicated, constitutional considerations will likely mandate such protections.

The difficulty of reviewing a (b)(2) class that does not address notice and opt-out is evident when examining the first of the

---

11. At the time the class was certified, rule 42 (unlike its federal counterpart) required individual notice to members of (b)(2) classes. *Compare* TEX.R. CIV. P. 42(c)(2), 553–554 S.W.2d (Tex.Cases) XXXVI–XXXVII (1977, amended 2004), *with* FED.R.CIV.P. 23(c)(2) (individual notice required only for (b)(3) classes). Rule 42 was recently amended to conform more closely to federal rule 23 and no longer mandates individual notice for (b)(2) classes. *See* TEX.R. CIV. P. 42(c)(2)(A) ("For any class certified under Rule 42(b)(1) or (2), the court *may* direct appropriate notice to the class.") (emphasis added).

12. The court of appeals appears to have been confused on this point. Although purportedly affirming only the (b)(2) class, that court held that individuals who suffered consequential damages would not be bound by the class judgment: "those parties can opt out of the class action and pursue their claims for data loss." 79 S.W.3d at 793.

(b)(2) classes certified by the trial court. With regard to that class, we must consider whether declaratory relief, to the exclusion of damages, is appropriate in this case. The Fifth Circuit recently reversed certification of a (b)(2) class in a case involving breach of warranty, fraud, and negligent misrepresentation claims alleged against a motor home manufacturer by a putative class of motor home purchasers. *See McManus v. Fleetwood Enters.*, 320 F.3d 545 (5th Cir.2003). The purchasers alleged that the manufacturer misrepresented that the motor home could safely tow 3,500 pounds when, in fact, supplemental brakes were required to safely tow that weight. The purchasers alleged breach of express and implied warranty claims, as well as violations of California's consumer protection statute. They sought injunctive relief under (b)(2) to compel Fleetwood to provide supplemental brakes and accurate information about the towing limitations. In the alternative, the purchasers sought damages under (b)(3). The district court certified a Texas-only subclass, and Fleetwood appealed. The Fifth Circuit first examined the history of (b)(2) and then noted that:

> Here, unlike *Bolin* and *Allison*, the district court certified the class under both (b)(2) and (b)(3), and the plaintiffs seek injunctive relief and damages as *alternative* remedies. Thus, *Allison* and *Bolin* are slightly off the mark. We need not ask whether damages "predominate"; we ask only whether injunctive relief, *to the exclusion* of damages is appropriate under Rule 23(b)(2). We conclude that it is not.
>
> . . .
>
> The McManuses lawsuit is markedly different from the paradigm Rule 23(b)(2) class action. First, the ordinary relief for their lawsuit would be money damages, not injunctive relief.
>
> . . .

Second, Fleetwood sold its motor homes over a limited period of time to a limited number of purchasers and does not have an ongoing relationship with its purchasers. Third, Fleetwood would have to provide *individual* relief, based on the various models of motor homes, to each individual plaintiff having purchased a motor home between 1994 and 1999, as opposed to a "uniform group remedy."

> . . .
>
> These sharp differences make the class-wide injunctive relief contemplated under Rule 23(b)(2) inappropriate to this case. We could find no case where injunctive relief was awarded under comparable circumstances. This result is unsurprising because damages would be the superior remedy especially considering that some class members may already own, or have no need for, supplemental brakes. We emphasize that otherwise inappropriate injunctive relief does not become appropriate for class treatment merely because the more permissive Rule 23(b)(2), as opposed to (b)(3), contemplates injunctive relief. The district court abused its discretion in allowing the Rule 23(b) classifications to inform the appropriate remedy, instead of vice versa.

320 F.3d at 553–54 (emphasis in original) (citations omitted). Finally, the court concluded:

> Moreover, permitting this lawsuit to continue as a Rule 23(b)(2) class would undo the careful interplay between Rules 23(b)(2) and (b)(3). That is, the class members would potentially receive a poor substitute for individualized money damages without the corresponding notice and opt-out benefits of Rule 23(b)(3); and defendants would potentially be forced to pay what is effectively money damages, without the benefit of requiring plaintiffs to meet the rigorous

Rule 23(b)(3) requirements. We conclude that the district court abused its discretion in certifying the class under Rule 23(b)(2).

*Id.* at 554 (citation omitted).

We share the same concerns about plaintiffs' claims for declaratory relief—to the exclusion of damages—in this case. The ordinary remedy for a breach of warranty claim is damages, not declaratory relief like that sought here. *See, e.g.,* TEX. BUS. & COM. CODE § 2.714(b) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."). Plaintiffs' expert witnesses testified variously that: "the instant case ... is a commercial case asserting at bottom damages for breach of an express warranty"; "this is a garden variety, plain vanilla consumer class action for modest damages per unit"; and "[t]his is a classic 'consumer' class action in which the claimed injuries are economic in scope." Similarly, Compaq sold the thirty-seven affected Presario models to the purchasers but, in all likelihood, does not have an ongoing relationship with them. Thus, relief would have to be individualized, at least to some extent. Purchasers who bought the affected computers may no longer own them. Like the Fifth Circuit in *Fleetwood,* "we could find no case where injunctive relief was awarded under comparable circumstances." *Fleetwood,* 320 F.3d at 554. Rather, as to the (b)(2) claims for declaratory relief to the exclusion of damages, it appears the plaintiffs have tried to "shoehorn" their damages action into the "(b)(2) framework, depriving class members of notice and opt-out protections." *Bolin,* 231 F.3d at 976. We note, however, that these concerns will become largely irrelevant if, on remand, the trial court orders notice and opt-out for the (b)(2) class members.

## IV

### Cohesiveness v. Predominance and Superiority

We now turn to whether parties may evade *Bernal* by seeking (b)(2) certification. Put simply, they may not. Although (b)(2) does not explicitly require predominance and superiority as (b)(3) does, (b)(2) does require a rigorous analysis of "cohesiveness." *See, e.g., Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 143 (3d Cir.1998)(noting that "[w]hile 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive"). Generally, (b)(2) classes are premised on an assumption of homogeneity. *See Allison,* 151 F.3d at 413 ("[B]ecause of the group nature of the harm alleged and the broad character of the relief sought, the (b)(2) class is, by its very nature, assumed to be a homogeneous and cohesive group with few conflicting interests among its members."). They are presumed to be cohesive, hence notice and opt-out are not mandated by the rules. *See Holmes v. Cont'l Can Co.,* 706 F.2d 1144, 1155 n. 8 (11th Cir.1983) ("At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness.... Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a (b)(2) class are generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender.") (quoting Note, *Notice in Rule 23(b)(2) Class Actions for Monetary Relief:* Johnson v. General Motors Corp., 128 U. PA. L.REV. 1236, 1252–53 (1980) (footnotes omitted)). "[T]he predomination requirement of Rule 23(b)(2) serves essentially the same functions as the procedural

safeguards and efficiency and manageability standards mandated in (b)(3) class actions." *Allison,* 151 F.3d at 414–15; *see also Coleman,* 296 F.3d at 448; *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 955 (E.D.Tex.2000) (predomination "protects absent plaintiffs' rights to due process by showing that a class is cohesive").

 We disagree, therefore, with the trial court's statement that "[n]amed Plaintiffs are *not* required to show predominance, superiority, or manageability in order to certify a class under TRCP 42(b)(2)." (Emphasis in original.) Similarly, parties cannot evade the "rigorous analysis" requirement by seeking (b)(2) certification. In *Bernal,* we held that "[c]ourts must perform a 'rigorous analysis' before ruling on class certification to determine whether *all* prerequisites to certification have been met." *Bernal,* 22 S.W.3d at 435 (quoting *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740(1982)) (emphasis added). All prerequisites means all prerequisites. This includes all four elements of rule 42(a) as well as one of several elements of rule 42(b). If (b)(2) certification is sought, therefore, the trial court must rigorously analyze cohesiveness.

 We recognize that "[c]lass cohesion is not a self-defining concept. How much cohesion is needed logically should depend on whether the class member has a right to exit." John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation,* 100 COLUM. L.REV. 370, 435 (2000). In many cases, this analysis will be identical to the "predominance and superiority" directive undertaken by trial courts certifying (b)(3) classes. *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 594, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (predominance "tests whether proposed classes are sufficiently *cohesive* to

warrant adjudication by representation") (emphasis added). However, "a more rigorous definition of class cohesion should apply in the case of the mandatory class action where the class member is essentially being coerced into participation." Coffee, *supra,* at 435. As the Third Circuit has noted, in such cases a (b)(2) class "may require more cohesiveness than [a] (b)(3) class. This is so because in [a] (b)(2) action, unnamed members are bound by the action without the opportunity to opt out." *Barnes,* 161 F.3d at 142–43; *see also* Coffee, *supra,* at 435 (noting that the *Barnes* court's cohesiveness "logic not only makes good normative sense, but it supplies the necessary deterrent to prevent the misuse of Rule 23(b)(1) and (b)(2) class actions as a means of evading the greater procedural protections built into Rule 23(b)(3)"). Of course, if a trial court determines that notice and opt-out should be provided in the (b)(2) setting, the cohesiveness required in a (b)(2) class need not be greater than the predominance and superiority necessary for a class certified under (b)(3).

In this case, in addition to the notice and opt-out issues identified above, the trial court did not rigorously analyze cohesiveness. For these reasons, we reverse that part of the court of appeals' judgment affirming certification of the (b)(2) class. Because the court of appeals also affirmed certification under (b)(3), we now turn to those allegations.

## V

### Choice of Law

 Although we review the trial court's order for abuse of discretion, we do not indulge every presumption in its favor, as compliance with class action requirements must be demonstrated rather than presumed. *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 691 (Tex.2002). We

also must evaluate "the claims, defenses, relevant facts, and applicable substantive law." *Bernal,* 22 S.W.3d at 435. In so doing, trial courts must abandon the practice of postponing choice-of-law questions until after certification, as courts can hardly evaluate the claims, defenses, or applicable law without knowing what that law is. *See Tracker Marine, L.P. v. Ogle,* 108 S.W.3d 349, 351–52 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *see also Spence v. Glock,* 227 F.3d 308, 313 (5th Cir.2000) (holding that "[t]he district court is required to know which law will apply before it makes its predominance determination").

As more fully set forth above, the trial court's order—which came after *Bernal* but before *Schein*—stated that "no Texas Supreme Court case requires this Court to make a choice of law determination at this time." Accordingly, the trial court identified "the choice of law rulings that it likely will make based on the disputed certification record." The trial court stated that it "believe[d] that it can properly apply Texas law to all claims covered by this nationwide class action" but concluded that it would revisit the issue if Compaq sought to litigate an issue on which Texas law differed from other jurisdictions. We rejected this "certify now and worry later" approach in *Bernal. Bernal,* 22 S.W.3d at 435. Instead, when ruling on motions for class certifications, trial courts must conduct an extensive choice of law analysis before they can determine predominance, superiority, cohesiveness, and even manageability. Thus, we proceed first to an analysis of the choice of law.

■ Compaq challenges the trial court's belief that Texas law governs all class members' claims. Generally, the issue of which state's law applies is a question of law we resolve by reviewing the record de novo. *Minn. Mining & Mfg. Co. v. Nishika, Ltd.,* 955 S.W.2d 853, 856 (Tex.1996); *see also Brainard v. State,* 12

S.W.3d 6, 30 (Tex.1999) ("In applying [abuse of discretion] standard, we defer to the trial court's factual determinations if they are supported by the evidence and review its legal determinations de novo."). In the context of a nationwide class action, the determination of the applicable substantive law is of paramount importance. If the court does not know which states' laws must be applied, it cannot determine whether variations in the applicable laws would defeat predominance in a (b)(3) class action or destroy the cohesiveness of a (b)(2) class. *See, e.g., In re Propulsid Prods. Liab. Litig.,* 208 F.R.D. 133, 146 (E.D.La.2002) ("The need for manageability at trial which has been clearly recognized by the Fifth Circuit and other circuits in (b)(3) actions also exists in (b)(2) actions. The application of multiple state laws to a class makes manageability more difficult in both (b)(3) and (b)(2) class actions.").

■ If the laws of fifty-one jurisdictions apply in this class action, the variations in the laws of the states and District of Columbia "may swamp any common issues and defeat predominance." *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 741 (5th Cir.1996). The threshold question for this Court, therefore, is whether the trial court conducted a proper choice of law analysis and correctly decided that Texas law controlled. *Spence,* 227 F.3d at 311; *Castano,* 84 F.3d at 741. In reviewing the trial court's decision, we must first decide whether Texas law conflicts with the laws of other interested states, as there can be no harm in applying Texas law if there is no conflict. The class representatives bear the burden of establishing the prerequisites for class treatment, so they must present an extensive analysis of state law evaluating any differences. *See Spence,* 227 F.3d at 313. A court may not accept "on faith" a party's assertion that no varia-

tions in state laws exist; plaintiffs, as class action proponents, must show that it is accurate. *Castano,* 84 F.3d at 741.

▮ The trial court found that it could apply Texas law to all claims in part because "no real conflict between Texas law and the law of any other jurisdiction with equally substantial connections to this dispute is currently presented." The trial court reached this conclusion after a cursory analysis of the law of other jurisdictions. While the court accurately noted that both parties submitted extensive choice-of-law research, expert reports, and summaries of the law, the trial court did not analyze the laws of the various jurisdictions, concluding instead in one sentence that "this Court finds that any variations in the law of the affected jurisdictions do not render the case unmanageable." Its only support for this statement was its criticism of Compaq's position, noting that "Compaq seems to think that it can forestall a class action by finding a conflict of law with respect to any issue that could conceivably arise in hypothetical warranty litigation." The trial court then noted that Compaq's corporate representative had testified that warranty claims were not affected by the state in which the consumer lived. For those reasons, the trial court held that there was no real variation in the law of the affected jurisdictions on the legal theories alleged but stated that it would "revisit the matter, and with it the predominance inquiry, if and when Compaq actually seeks to litigate an issue concerning which Texas law conflicts with the law of some other state with contacts to this dispute that rival those of Texas." *See Castano,* 84 F.3d at 742–43 (criticizing the district court for "a cursory review of state law variations and [giving] short shrift to the defendants' arguments concerning variations"). Thus, "[n]othing in the record demonstrates that the court critically analyzed how variations in state

law would affect predominance." *Id.* at 743.

The court of appeals also failed to undertake the critical analysis necessary to a proper choice-of-law determination. 79 S.W.3d at 791–92. On the choice-of-law issue, the court of appeals held only that federal cases relied on by Compaq were inapposite and that, under *Microsoft Corp. v. Manning,* 914 S.W.2d 602 (Tex.App.-Texarkana 1995, writ dism'd), Texas would recognize a warranty claim for a so-called "unmanifested defect." *Id.* at 792.

▮ Thus, despite the extensive choice-of-law analysis presented by both sides, neither the trial court nor the court of appeals analyzed the differences, if any, of the laws of other states. Accordingly, "we do not have the benefit of an analysis of those differences by the lower courts." *Schein,* 102 S.W.3d at 697. As "guardian[s] of absent claimants' rights, courts have an independent duty to determine uniformity sua sponte, even if neither party raises it." *Gen. Motors Corp. v. Bloyed,* 916 S.W.2d 949, 954 (Tex.1996); *see also Stirman v. Exxon Corp.,* 280 F.3d 554, 563 n. 7 (5th Cir.2002).

The lower courts erred by failing to conduct a state-by-state analysis of the questions of law presented. Those courts never assessed the substance of other states' laws but instead concluded that the theory was sound under Texas law. A proper review would have analyzed the relevant law of each state and the variations among states. *Stirman,* 280 F.3d at 564–66. Below, we outline some of the differences in various states' laws, "to demonstrate the inquiry the [lower courts] failed to make." *Castano,* 84 F.3d at 743. While this case involves a Uniform Commercial Code breach of express warranty claim, it seems that "the Uniform Commercial Code is not uniform." *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1016

(D.C.Cir.1986) (citing J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE 7 (2d ed.1980)).

### A. Notice

Section 2–607 of the UCC addresses notice of breach. The provision has been adopted verbatim by all states except Maine and South Carolina.[13] Maine does not require notice "where the remedy is for personal injury resulting from any breach." ME.REV.STAT. ANN. tit. 11, § 2–607(7) (West 1995). South Carolina does not require "notice of injury to the person in the case of consumer goods." S.C.CODE ANN. § 36–2–607(3) (Law. Co-op 1976). Even discounting these differences, however, cases from different jurisdictions interpret the notice requirement differently. Some states require that notice of a warranty claim against a remote manufacturer be given directly to that entity. *See The Church of the Nativity of Our Lord v. WatPro, Inc.,* 474 N.W.2d 605, 609 (Minn.Ct.App.1991) ("jurisdictions are divided on the issue ... whether a buyer must also notify the manufacturer in order to sue the manufacturer for breach of warranties."); *Halprin v. Ford Motor Co.,* 107 N.C.App. 423, 420 S.E.2d 686, 688 (1992) ("the jurisdictions are split on whether this notice provision of the Code requires notice to the remote manufacturer"). For example, in *Wilcox v. Hillcrest Memorial Park of Dallas,* the court held that section 2.607(c)(1) "requires that a buyer notify any seller, including a remote seller such as the manufacturer, of the product's alleged defect within a reasonable time of discovering the defect and that failure to do so bars the buyer from any remedy for breach of warranty under the Texas Busi-

ness & Commerce Code."[14] *Wilcox,* 696 S.W.2d 423, 424–25 (Tex.App.-Dallas 1985, writ ref'd n.r.e.); *accord U.S. Tire–Tech, Inc. v. Boeran, B.V.,* 110 S.W.3d 194, 199 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (requiring notice to manufacturer); *Western Equip. Co. v. Sheridan Iron Works, Inc.,* 605 P.2d 806, 810–11 (Wyo. 1980) (same).

Conversely, the Colorado Supreme Court has held that:

> [T]he language of section 4–2–607(3)(a) is unambiguous: it requires a buyer to give notice of a defective product only to the 'seller.' *See* 2 Anderson, Uniform Commercial Code § 2.607:24. The General Assembly has not elected to require advance notice to a manufacturer of litigation for breach of the manufacturer's warranty of a product, and we find no compelling reason to create such a condition precedent judicially in the context of commercial litigation.

*Cooley v. Big Horn Harvestore Systems, Inc.,* 813 P.2d 736, 741 (Colo.1991) (noting that Maryland courts reached a similar result but Alaska, Illinois, and Wyoming did not); *see also Cipollone v. Liggett Group, Inc.,* 683 F.Supp. 1487, 1497–98 (D.N.J.1988) (predicting that New Jersey Supreme Court would require notice to immediate seller only); *Owens v. Glendale Optical Co.,* 590 F.Supp. 32, 36 (S.D.Ill. 1984) ("Illinois law holds that notification of a breach need only be given to the immediate seller"); *Firestone Tire & Rubber Co. v. Cannon,* 53 Md.App. 106, 452 A.2d 192, 198 (1982) ("seller" in 2–607 means only the immediate seller); *Seaside Resorts, Inc. v. Club Car, Inc.,* 308 S.C. 47,

---

**13.** The Oklahoma statute differs in that subsection (6) refers to 2–312(3)(b), rather than 2–312(3).

**14.** Finding no reversible error, we refused the writ of error in *Wilcox,* expressly reserving

judgment on the question of whether a buyer must notify a remote seller-manufacturer of an alleged breach of warranty within a reasonable time. *Wilcox v. Hillcrest Mem'l Park of Dallas,* 701 S.W.2d 842, 843 (Tex.1986). We have not since decided the issue.

416 S.E.2d 655, 663 (Ct.App.1992) (section 2–607 "requires a retail buyer to notify only the retail seller who tendered the goods to him, not wholesalers, distributors, manufacturers, or others who sold the goods further up the chain of commerce"). Still other states have softened or eliminated the notice requirement altogether in cases involving consumer transactions. *Firestone,* 452 A.2d at 197 ("it is not difficult to imagine the injustice that would be caused to consumers from requiring notice to each person in the chain"); *Fischer v. Mead Johnson Labs.,* 41 A.D.2d 737, 341 N.Y.S.2d 257, 259 (N.Y.App.Div.1973) (timely notice requirement should be overlooked in case involving user of prescription drug).

These differences are significant. In this case, the parties dispute whether the notice requirement has been satisfied. Compaq denies that it received pre-suit notice from most of the putative class members; conversely, one of the named plaintiffs claims to have met the notice prerequisite by giving Compaq written notice on behalf of the entire uncertified class. This issue may be critical. If, for example, a putative class member lived in a state that required notice only to the immediate seller (and not the manufacturer), and that class member notified the immediate seller of the product defect, that class member should be deemed to have satisfied the notice requirement even if the manufacturer was not specifically advised of the claim. On the other hand, if that class member lived in a state that required notice to the manufacturer, failure to give that notice could bar the claim.

### B. Reliance

Section 2–313 of the UCC addresses the creation of express warranties. That section incorporates a reliance element, providing that a seller's statement that is "part of the basis of the bargain" creates an express warranty. U.C.C. § 2–313.

This provision has been adopted verbatim by all states except Maine, Michigan, and South Carolina, which adopted the section with minor changes. South Carolina added language to section 2–313(1)(a), so that it reads: "Any affirmation of fact or promise, *including those on containers or labels,* made by the seller to the buyer, *whether directly or indirectly,* which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods conform to the affirmation or promise." S.C.Code Ann. § 36–2–313(1)(a) (Law.Co-op.1976) (emphasis added to show additions).

Although the official comments to section 2–313 provide that "no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement," U.C.C. § 2–313 cmt. 3 (1989), it appears that this suggestion is not uniformly followed. Like the notice requirement, state courts have interpreted this reliance element differently. *See McManus v. Fleetwood Enters., Inc.,* 320 F.3d 545, 550 (5th Cir.2003) ("There is a split of authority as to whether [the "basis of the bargain"] wording ... is meant to dispense with the common law's requirement of reliance in express warranty cases.") (citing Charles A. Heckman, *"Reliance" or "Common Honesty of Speech": The History and Interpretation of Section 2–313 of the Uniform Commercial Code?,* 38 CASE W. RES. L.REV. 1 (1987)). Some courts have concluded that reliance by a buyer on a seller's statements (even those contained in a warranty) remains an essential element of a breach of express warranty claim under the basis of the bargain test as set forth in the UCC. *See, e.g., Speed Fastners, Inc. v. Newsom,* 382 F.2d 395, 397, 399–400 (10th Cir.1967) (sale of stud fasteners; plaintiff not entitled to recover in breach of express warranty where no evidence that plaintiff's employer relied on statements in seller's pamphlet before

purchase); *DiIenno v. Libbey Glass Div., Owens–Ill., Inc.*, 668 F.Supp. 373, 376 (D.De.1987) (reliance required to assert express warranty claim under Delaware UCC); *Global Truck & Equip. Co. v. Palmer Mach. Works, Inc.*, 628 F.Supp. 641, 651–52 (N.D.Miss.1986) (buyer could not recover for breach of express warranty absent proof that buyer relied on statements prior to or contemporaneously with sale); *Hagenbuch v. Snap–On Tools Corp.*, 339 F.Supp. 676, 680 (D.N.H.1972) (sale of hammer; plaintiff not entitled to recover for breach of express warranty where no evidence that buyer relied on statements in seller's catalogue); *Ciba–Geigy Corp. v. Alter*, 309 Ark. 426, 834 S.W.2d 136, 147 (1992) ("When a buyer is not influenced by the statement in making his or her purchase, the statement is not a basis of the bargain."); *Stamm v. Wilder Travel Trailers*, 44 Ill.App.3d 530, 3 Ill.Dec. 215, 358 N.E.2d 382, 385 (1976) ("cases under the [Illinois] Commercial Code require a reliance by the buyer upon the promise, affirmation or description."); *Scaringe v. Holstein*, 103 A.D.2d 880, 477 N.Y.S.2d 903, 904 (1984)(same); *Thomas v. Amway Corp.*, 488 A.2d 716, 720 (R.I.1985) (plaintiff must prove reliance in an express warranty action).

Other courts hold that under the UCC, reliance is no longer required and a buyer may recover on an express warranty even if the buyer never actually received a copy of the warranty and was unaware of its existence. *See, e.g., Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 645 (10th Cir.1991) (seed brochure; reliance not required under Colorado law); *Winston Indus., Inc. v. Stuyvesant Ins. Co.*, 55 Ala. App. 525, 317 So.2d 493, 497 (1975), *cert. denied*, 294 Ala. 775, 317 So.2d 500 (1975) (sale of mobile home; unnecessary to show "any particular reliance" by purchaser even though purchaser did not physically receive written copy of the warranty and was unaware of its existence); *Torres v.*

*Northwest Eng'g Co.*, 86 Hawai'i 383, 949 P.2d 1004, 1013 (Ct.App.1997) ("reliance is not an essential element of a breach of express warranty claim under the UCC"); *Hawkins Constr. Co. v. Matthews Co.*, 190 Neb. 546, 209 N.W.2d 643, 654–55 (1973) (sale of scaffolding; express warranty created even if buyer did not rely on statements in seller's brochure), *overruled on other grounds by Nat'l Crane Corp. v. Ohio Steel Tube Co.*, 213 Neb. 782, 332 N.W.2d 39 (1983); *Daughtrey v. Ashe*, 243 Va. 73, 413 S.E.2d 336, 338–39 (1992) ("basis of the bargain" does not establish "a buyer's reliance requirement"; "We conclude from the language used in Code § 8.2–313 and the Official Comment thereto that the drafters of the Uniform Commercial Code intended to modify the traditional requirement of buyer reliance on express warranties.").

Still other states have not decided whether reliance is required, nor what the "basis of the bargain" actually means. *See* James J. White, *Freeing the Tortious Soul of Express Warranty Law*, 72 TUL. L.REV. 2089, 2099–2102 (June 1998) ("The great majority of cases [surveyed regarding § 2–313] had no explicit statement on whether basis of the bargain did or did not require reliance, but one might draw inferences about courts' views based upon what was said and what was left unsaid in the opinions.... Many of the cases that do not explicitly mention basis of the bargain as a reliance requirement nevertheless are careful to point out that the plaintiff in that case did rely. Others merely reiterate the basis of the bargain language."). Under Texas law, we have said that "[r]eliance is ... not only relevant to, but an element of proof of, plaintiffs' claims of breach of express warranty (to a certain extent)...." *Schein*, 102 S.W.3d at 686. In an earlier case, we held:

Though not a fraud-based claim, an express warranty claim also requires a

form of reliance. The Uniform Commercial Code provides that an express warranty is created when "[a]ny affirmation of fact or promise [is] made by the seller to the buyer which relates to the goods and becomes part of the *basis of the bargain.*" TEX. BUS. & COM. CODE § 2.313(a)(1) (emphasis added). "Basis of the bargain" loosely reflects the common-law express warranty requirement of reliance.

*American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 436 (Tex.1997) (citing in part *Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 575 & n. 2 (Tex.1991) and *Shamrock Fuel & Oil Sales Co. v. Tunks,* 416 S.W.2d 779, 786 (Tex.1967)).

Another difference among states is the timing of reliance and, specifically, whether warranties not relied on prior to the sale can form the basis of an express warranty claim. *Compare Downie v. Abex Corp.,* 741 F.2d 1235, 1238 n. 1, 1240 (10th Cir.1984) (under both Utah and California law, UCC "clearly contemplates that warranties made after the sale may become a basis of the bargain"), *and Autzen v. John C. Taylor Lumber Sales, Inc.,* 280 Or. 783, 572 P.2d 1322, 1326 (1977) (post-sale survey of a used boat can create an express warranty if it "induce[d] and [was] intended by the Seller to induce Buyer's satisfaction with the agreement just made"), *with DiIenno,* 668 F.Supp. at 376 (express warranty claim failed where there was no evidence plaintiff saw the warranty before making her purchase), *Ciba–Geigy Corp.,* 834 S.W.2d at 147 (breach of express warranty claim failed when plaintiff did not recall reading the express warranty before making his purchase), *Schmaltz v. Nissen,* 431 N.W.2d 657, 661 (S.D.1988) (language on seed bags could not have been basis of the bargain, when purchasers did not read the language until after the sale was completed), *Cuthbertson v. Clark Equip. Co.,* 448 A.2d 315 (Me.1982) (owner's manual not seen prior to sale could not be part of

"basis of the bargain"), *and Anderson v. Heron Eng'g Co.,* 198 Colo. 391, 604 P.2d 674, 676 (1979) (brochure must have been seen or relied on at time of purchase).

**C. Remedies**

Finally, we examine the remedies available under the various states' laws. Section 2–714 of the UCC provides:

(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

This provision has been adopted verbatim by all states except Alabama, which adds that this section shall not limit a seller's liability for personal injury damages involving consumer goods. ALA.CODE § 7–2–714 (2004). The UCC official comment explains: "The 'non-conformity' referred to in subsection (1) includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract." U.C.C. § 2.714, cmt. 2.

Of primary import here is whether plaintiffs can recover on express warranty claims based on so-called unmanifested defects. Compaq argues that most states do not allow breach of warranty claims for products that have not malfunctioned. The plaintiffs respond that, under the

UCC, all they must prove is a non-conformity of tender to recover "benefit of the bargain damages."

The law on this particular subject does not appear to be well developed in any jurisdiction. Compaq cites a few cases, some of which involve express warranty claims and some of which do not, for the proposition that most states reject such a claim. Chief among these is *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir.2002). In that case, plaintiffs sued Bridgestone/Firestone, alleging that the tires on their vehicles were defective. Plaintiffs moved for class certification, and the district court certified two nationwide class actions. Bridgestone/Firestone appealed. The Seventh Circuit Court of Appeals reversed, noting:

> Plaintiffs describe the injury as financial rather than physical and seek to move the suit out of the tort domain and into that of contract (the vehicle was not the flawless one described and thus is not merchantable, a warranty theory) and consumer fraud (on the theory that selling products with undisclosed attributes, and thus worth less than represented, is fraudulent). It is not clear that this maneuver actually moves the locus from tort to contract. If tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly mean excess compensation. As a result, most states would not entertain the sort of theory that plaintiffs press. *See, e.g., Briehl v. General Motors Corp.*, 172 F.3d 623, 628 (8th Cir.1999) (Mississippi, New York, Pennsylvania, and Texas law); *Angus v. Shiley, Inc.*, 989 F.2d 142, 147–48 (3d Cir.1993) (Pennsylvania law); *Willett v. Baxter International, Inc.*, 929 F.2d 1094, 1099–1100 (5th Cir. 1991) (Louisiana law); *Carlson v. General Motors Corp.*, 883 F.2d 287, 298 (4th Cir.1989) (South Carolina law); *American Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 44 Cal. Rptr.2d 526 (1995); *Ford Motor Co. v. Rice*, 726 So.2d 626, 627, 631 (Ala.1998); *Yu v. IBM Corp.*, 314 Ill.App.3d 892, 732 N.E.2d 1173, 247 Ill.Dec. 841 (1st Dist. 2000); *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187, 192 (Ky.1994).

288 F.3d at 1017 (footnote omitted).

We note, however, that the *Bridgestone/Firestone* court did not address the plaintiffs' express warranty claim. Moreover, the tires in that case had already been recalled and replaced, possibly satisfying any express warranty requirements. Many of the cases relied on by the Seventh Circuit did not involve express warranty claims but instead involved implied warranty and tort claims. *See, e.g., Angus v. Shiley, Inc.*, 989 F.2d 142, 147–48 (3d Cir. 1993) (intentional and negligent infliction of emotional distress); *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098–1100 (5th Cir.1991) (failure to warn); *Carlson v. General Motors Corp.*, 883 F.2d 287, 298 (4th Cir.1989) (implied warranty); *Ford Motor Co. v. Rice*, 726 So.2d 626, 627, 631 (Ala.1998) (fraudulent suppression); *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187, 192 (Ky.1994) (negligence and intentional infliction of emotional distress); *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 44 Cal.Rptr.2d 526, 528 (1995) (implied warranty).

Conversely, however, there is a dearth of caselaw recognizing such claims in the express warranty context. The Fifth Circuit Court of Appeals recently examined whether, under Texas and Florida law, a boat purchaser had stated a claim against a boat manufacturer, who had allegedly represented a hybrid plywood/fiberglass boat to be all fiberglass. *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449 (5th Cir. 2001). The district court dismissed the case pursuant to Rule 12(b)(6), Fed.R.Civ. P., concluding that the plaintiffs had failed to allege any real damages. On appeal, the

Fifth Circuit noted that "[t]he only damage sought by the [purchasers] is the benefit of their bargain ... or the difference in value between what they were promised, an all fiberglass boat, and what they received, a hybrid wood-fiberglass boat." 240 F.3d at 452. The court continued:

Along with the "out of pocket" damages formula, which measures the difference between what the plaintiff paid in consideration and what he actually received, "benefit of the bargain" is a standard method for measuring damages in fraudulent representation and certain contract cases. The benefit of the bargain measure of damages is neither novel nor exotic. . . .

As the Coghlans contend, Texas and Florida permit recovery of benefit of the bargain damages in certain contexts.

*Id.* at 452–53 (citations omitted). The court then concluded that both Texas and Florida permitted recovery of such damages for fraud, DTPA, and breach of contract claims (no express warranty claim was alleged), and Florida also recognized such damages in negligent misrepresentation cases. The court noted:

While we share the district court's implicit concern over the rise of 'no-injury' product liability lawsuits, the district court acted prematurely in dismissing this case *sua sponte* on the pleadings: the determination that there has been no injury in this case must be an evidentiary one, since the relevant state jurisdictions recognize benefit of the bargain damages for the claims that the Coghlans allege.

*Id.* at 454 (footnote omitted). In a footnote, the court explained the distinction:

The key distinction between this case and a "no injury" product liability suit is that the Coghlans' claims are rooted in basic contract law rather than the law of product liability: the Coghlans assert they were promised one thing but were given a different, less valuable thing. The core allegation in a no-injury product liability class action is essentially the same as in a traditional products liability case: the defendant produced or sold a defective product and/or failed to warn of the product's dangers. The wrongful act in a no-injury products suit is thus the placing of a dangerous/defective product in the stream of commerce. In contrast, the wrongful act alleged by the Coghlans is Wellcraft's failure to uphold its end of their bargain and to deliver what was promised. The striking feature of a typical no-injury class is that the plaintiffs have either not yet experienced a malfunction because of the alleged defect or have experienced a malfunction but not been harmed by it. Therefore, the plaintiffs in a no-injury products liability case have not suffered any physical harm or out-of-pocket economic loss. Here, the damages sought by the Coghlans are not rooted in the alleged defect of the product as such, but in the fact that they did not receive the benefit of their bargain. It is worth noting that the no-injury approach to product litigation has been rejected in several recent decisions.

240 F.3d at 455 n. 4 (citations omitted).

Thus, to the extent they have squarely analyzed (and very few have) whether to permit express warranty claims for unmanifested defects, courts reach different results. While the law of some states appears to conflict, the law in most states (including Texas)[15] is unclear. Some

---

15. We do not reach the issue in this case but note that, in varying contexts, our courts of appeals have reached different conclusions on whether parties may recover damages for un-

manifested defects. *Compare Tracker Marine,* 108 S.W.3d at 362 (noting that benefit of the bargain damages for unmanifested defects "look[ ] suspiciously like a claim for fear of

states may recognize such claims, but we cannot say that all fifty-one jurisdictions would. In *Schein*, we cautioned against class certification in which judges and lawyers had to guess, "What *is* the law of Michigan, or Arkansas, or Guam, as applied to this problem?" *Schein*, 102 S.W.3d at 700 (quoting *Bridgestone/Firestone*, 288 F.3d at 1020) (emphasis in original); *see also Tracker Marine*, 108 S.W.3d at 363 (noting that "[t]he novelty and complexity of these issues counsels against any sort of mass trial until some of them are settled").

The conflicts on this and the other issues outlined above are substantial. Nor is mention of these conflicts, as the trial court suggested, necessarily an attempt to "forestall a class action by finding a conflict of law with respect to any issue that could conceivably arise in hypothetical warranty litigation." Each of the issues outlined above impacts either an element of, or a condition precedent to, a UCC-based express warranty claim. *See, e.g., Schein*, 102 S.W.3d at 686 ("[r]eliance is ... an element of proof of, plaintiffs' claims of breach of express warranty (to a certain extent)"); *U.S. Tire–Tech*, 110 S.W.3d at 200 (collecting cases from multiple jurisdictions holding that notice is a condition precedent to a breach of express warranty claim). We cannot, therefore, affirm the application of Texas law on the basis that the law of all jurisdictions is identical. Instead, to review how the class claims will be tried, we must first review which law will apply. *See Tracker Marine*, 108 S.W.3d at 354–55.

### D. Most Significant Relationship

The Due Process Clause limits the extent to which one state's law can be applied to claims that arise in many states. *See Shutts*, 472 U.S. at 821–22, 105 S.Ct. 2965. Absent a contractual choice-of-law provision, express warranty claims in Texas may be governed by Texas law if the "transaction[ ] bear[s] an appropriate relation to this state." TEX. BUS. & COM. CODE § 1.301(a). In this case, the parties have asserted, and the trial court applied, the Restatement's "most significant relationship" test. Accordingly, we will examine the contacts under that standard.

Section 188 of the Restatement (Second) of Conflict of Laws delineates the general principles that inform a choice of law determination on a contract issue. They include: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the contract's subject matter; and (5) the domicile, residence, place of incorporation and place of business of the parties. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188.

The trial court found that "Compaq is headquartered in Texas and incorporated here." The trial court then listed Compaq's Texas contacts and noted:

> Compaq's only possible response to this analysis is the argument that each buyer's domicile determines the law that must be applied to that buyer's claim. This is in fact what Compaq asserts. On this disputed record, the Court does not find that argument supported by the record.

future injury to property, which Texas has rejected") (citation omitted) *with Microsoft Corp. v. Manning*, 914 S.W.2d 602, 609 (Tex. App.-Texarkana 1995, writ dism'd) (recognizing breach of warranty claim for unmanifested defect: "We believe that, if appellees prove that an individual defect exists in all original

MS–DOS 6.0 software, it is not necessary for the purchasers to actually suffer a loss of data as a result of that defect for them to suffer damage. They have received less than they bargained for when they acquired the product.").

In *Schein,* we stated that "Texas ... does not apply the law of the state where a defendant is headquartered to every claim for economic damages that can be alleged...." *Schein,* 102 S.W.3d at 698. In the DTPA context, one court has commented that "Texas courts have usually applied our statute to consumer complaints that arose here regardless of the defendant's headquarters." *Tracker Marine,* 108 S.W.3d at 355. The Seventh Circuit has termed a district court's application of the law of the manufacturer's domicile to all consumer complaints "a novelty." *Bridgestone/Firestone,* 288 F.3d at 1016.

The putative class members are domiciled in the fifty states and the District of Columbia. All these fifty-one relevant jurisdictions are likely to be interested in ensuring that their consumers are adequately compensated for a breach of warranty. *See Spence,* 227 F.3d at 314. Texas law may not provide sufficient consumer protection in the view of the other states; indeed, as the home state of the manufacturer, Texas's "policies might tend to favor those interests over consumers." *Id.* (analyzing Georgia's interest). The place of contracting would presumably be the place of purchase; the location of performance and the location of the subject matter of the contract would be the place where the computer is used; and the place of negotiation would not apply. *Id.* at 314 n. 9 (noting that "[r]elated state policies of all the interested states would also, of course, need to be examined for a thorough approach to this issue"); *see also Bridgestone/Firestone,* 288 F.3d at 1016–17 (in a lex loci delicti state, "[i]f recovery for breach of warranty ... is possible, the injury is decidedly where the *consumer* is located, rather than where the seller maintains its headquarters") (emphasis in original). Thus, while Texas law will apply to claims by most of those who bought computers in this state, the class representatives have failed to demonstrate it will apply to the claims of out-of-state class members. *Tracker Marine,* 108 S.W.3d at 359. The differences in state law outlined above cannot be concealed in a throng. *Schein,* 102 S.W.3d at 693. The trial court abused its discretion, therefore, in holding that Texas law bore the most significant relationship to, and therefore governed, all class members' claims.

## VI

### Conclusion

■ We conclude that Rule 42(b)(3)'s predominance requirement is not satisfied. Accordingly, we need not consider Compaq's additional challenges to the other certification prerequisites. We reverse the court of appeals' judgment affirming the trial court's certification order and remand the case for further proceedings consistent with this opinion. TEX.R.APP. P. 60.2(d).

Chief Justice PHILLIPS did not participate in the decision.